111 F.3d 1273
 46 Fed. R. Evid. Serv. 1417
 NORTH AMERICAN SPECIALTY INSURANCE COMPANY, Plaintiff-Appellee,
v.
Shirley MYERS (96-1358), as Personal Representative of the
Estate of John Myers, deceased, Phyllis Huffman (96-1347),
as Personal Representative of the Estate of Arthur Huffman,
deceased, and Clare Colwell (96-1358),
Defendants/Third-Party Plaintiffs-Appellants,
Wenk Aviation Insurance Agency, Inc., and Charles H. Wenk,
Third-Party Defendants-Appellees.
 Nos. 96-1347, 96-1358.
 United States Court of Appeals,
Sixth Circuit.
 Argued March 20, 1997.
Decided April 16, 1997.
 
 Tobin H. Dust (briefed), Fordney, Dust & Prine, Saginaw, MI, Eric A. Cunningham, III, Michael G. McQuillen (argued and briefed), Adler, Murphy & McQuillen, Chicago, IL, for North American Specialty Ins. Co.
 Mark S. Lorence (briefed), Gaylord, MI, David Ian Katzman (briefed), John D. McClune (argued), Broomfield, CO, for Shirley Myers and Clare Colwell.
 Mark R. Daane (argued and briefed), Angela L. Jackson (briefed), Hooper, Hathaway, Price, Beuche & Wallace, Ann Arbor, MI, for Phyllis Huffman.
 Marilyn A. Madorsky (argued and briefed), Provizer, Lichtenstein & Phillips, Southfield, MI, for Wenk Aviation Ins. Co. and Charles H. Wenk.
 Before: KENNEDY, KRUPANSKY, and NORRIS, Circuit Judges.
 KENNEDY, Circuit Judge.
 
 
 1
 Defendants Shirley Myers, representative of the estate of John Myers, Clare Colwell, and Phyllis Huffman, representative of the estate of Arthur Huffman, appeal the grant of summary judgment by the District Court in favor of plaintiff North American Specialty Insurance Company ("NAS"). NAS sought a declaration that the insurance policy issued by it to Colwell and John Myers does not provide any coverage for the accident at issue. The Myers estate and Colwell also appeal the dismissal of their third-party complaint against third-party defendants Wenk Aviation Insurance Agency, Inc. and Charles Wenk (since the liability of Wenk and Wenk Aviation are the same, they will be referred to as "Wenk"). Finally, the Myers estate and Colwell appeal the denial of their motion for leave to amend their counter- and third-party complaints. For the following reason, we AFFIRM the rulings of the District Court.I.
 
 
 2
 In 1992, Colwell and John Myers purchased a 1959 single-engine Piper Comanche airplane. Colwell sought liability and hull insurance from Charles Wenk at Wenk Aviation on a recommendation from his flight instructor Tom Weiss. Wenk informed Colwell that he would search for quotes for a policy for the Piper Comanche and then call back. Wenk contacted and received a quote from Walter Weber, an underwriter at Southern Aviation, the underwriting department of NAS. Wenk called Colwell back with the quote from Weber, which Colwell accepted. Accordingly, Wenk requested Weber to bind coverage for the plane. Wenk further mailed on November 18, 1992 a binder letter and application ("binder") for the policy to Colwell and John Myers.
 
 
 3
 The binder, which represented an abbreviated description of the terms of the policy, indicated that the annual premium would be $1,013 and that coverage would include $23,000 for the hull and $1,000,000 in liability for each occurrence, limited to $100,000 for each passenger. Coverage commenced November 18, 1992. Under the section entitled "pilot information," the binder named the two insureds. The section also contained these two provisions:
 
 
 4
 Open Pilot Provisions: PVT/750TT/250RG/25M & M
 
 
 5
 Special Pilot Requirements: 15 DUAL W/CFI PRIOR TO SOLO
 
 
 6
 The parties agree that the "Special Pilot Requirements" apply to the insureds and indicate that, before either of the insureds could fly the plane alone, coverage is conditioned upon their having had fifteen hours of flight instruction with a certified flight instructor ("CFI"). Likewise, the parties agree that the "Open Pilot Provisions" require a pilot subject to its conditions to have had a private pilot's license, 750 hours of total flying time, 250 hours of flying a plane with retractable gear, and 25 hours of flying time in the same make and model aircraft as the insured plane.
 
 
 7
 The binder provided that "the terms and conditions of this application and the policy currently in use by the insurers shall be the basis of any contract between me/us and the insurance company." The document further stated that "there is no coverage in flight unless the aircraft is being operated by the pilot(s) designated on this document who has/have at least the certificate ratings and pilot experience indicated and who, is/are properly qualified for the flight involved."
 
 
 8
 After signing it on November 23, 1992, the insureds returned the completed binder with a $300 deposit to Wenk, who forwarded the application to NAS. On November 28, 1992, NAS signed the policy and issued the pilot requirements on December 1, 1992. Although Wenk received a copy of the policy from NAS shortly thereafter, he did not send a copy to the insureds until January 7, 1993.
 
 
 9
 On December 19, 1992, John Myers and Arthur Huffman, a CFI, left Otsego County Airport in Michigan to fly to North Carolina. One purpose of the flight was for Myers to receive his requisite training from Huffman. Shortly after take off, the plane crashed and both men died. Although it is unclear which man was flying the plane at the time of the crash, all parties have assumed that Huffman was piloting the craft. The Huffman estate, however, also has proceeded on the alternative theory that NAS has a duty to defend and indemnify the Myers estate and Colwell against its claims if Myers was piloting the plane during the accident.
 
 
 10
 The policy contains a section entitled "pilot requirements endorsement," which states in part that "[t]his policy is not in effect while the aircraft is in flight or in motion unless the pilot of the aircraft meets all the requirements specified herein." The section describes "persons permitted to fly the aircraft" as:
 
 
 11
 Clare Colwell, a private or commercial, single-engine land rated pilot to receive 15 hours of dual instruction in the insured aircraft by a FAA certified single-engine land flight instructor prior to solo in the insured aircraft.
 
 
 12
 John Myers, a private or commercial, single-engine land rated pilot to receive 15 hours of dual instruction in the insured aircraft by a FAA certified single-engine land flight instructor prior to solo in the insured aircraft.
 
 
 13
 Any FAA certified single-engine land flight instructor who has flown and logged at least 25 hours in the same make and model as the insured aircraft, only while instructing a named pilot listed above in the insured aircraft.
 
 
 14
 Or any private or commercial, single-engine land rated pilot who has flown 750 total logged hours including 250 hours in an aircraft equipped with retractable landing gear and 25 hours in the same make and model as the insured aircraft.
 
 
 15
 Invoking the above language and the provisions of the binder, NAS has declined to provide coverage for the accident on the basis that Arthur Huffman did not satisfy the requirement of having flown and logged twenty-five hours in the same make and model aircraft as the insured plane.
 
 
 16
 In Count I of its complaint based on diversity jurisdiction, NAS sought a declaratory judgment that, because Arthur Huffman did not satisfy the requirements applicable to CFIs, the policy provides no coverage for the crash and NAS has no duty to indemnify or defend against any claims brought against the Myers estate or Colwell. In Count II, NAS sought a declaratory judgment that it has no duty to indemnify or defend against any claims brought against the Huffman estate by any party, including the Myers estate and Colwell, because Huffman did not satisfy the conditions for coverage under the policy. Appellants soon filed counter-complaints against NAS alleging breach of contract and fraud, and later filed third-party complaints against Wenk and Wenk Aviation alleging similar claims.[1]
 
 
 17
 On June 16, 1995 NAS filed a motion for partial summary judgment on Count II of its complaint, and third-party defendants filed a motion for summary judgment on all claims against them by appellants. Further, the Myers estate filed a motion for summary judgment on its breach of contract and fraud claims.
 
 
 18
 On August 18, 1995, the District Court issued an opinion and order which granted the motions by NAS and Wenk and denied the motion by the Myers estate. Noting that the parties had assumed that Huffman was flying the plane for the purposes of Count II, the court found that the policy did not provide coverage for Arthur Huffman. The District Court also found that the Myers estate had no cause of action against appellees based on breach of contract or fraud. The District Court, however, did allow appellants leave to file a motion to amend their third-party complaints against Wenk and Wenk Aviation. The District Court later denied a motion for reconsideration filed by the Myers estate and Colwell; in that motion, appellants presented an affidavit which assertedly established that Arthur Huffman had satisfied the conditions of the policy.
 
 
 19
 The Myers estate and Colwell filed a motion for leave to amend their complaints against all appellees in order to include claims of negligence and estoppel. On October 18, 1995, the District Court denied this motion, concluding that because alleged statements and late delivery of the policy by Charles Wenk did not prevent appellees from enforcing the written terms of the policy, amendment would be futile.
 
 
 20
 On January 12, 1996, the District Court granted a motion for summary judgment by NAS as to Count I of its complaint, noting only that it was basing this ruling upon the same reasons explained in its August 18, 1995 grant of summary judgment as to Count II. This decision, coupled with other rulings which are not at issue during this appeal, resulted in the complete dismissal of the case. Appellants filed these timely consolidated appeals.
 
 
 21
 All appellants assert that there are genuine issues as to whether the policy required Arthur Huffman to have flown and logged twenty-five hours in the same make and model as the insured plane. The Myers estate and Colwell, however, also argue that Huffman in fact satisfied that requirement, that appellees are estopped from denying that the crash is an insured loss, and that the District Court should have granted their motion to amend their complaints.
 
 II.
 A.
 
 22
 Proceeding on the theory that Arthur Huffman was piloting the plane, all appellants argue that the "Open Pilot Provisions" of the binder, which required pilots other than the insureds to have logged twenty-five hours in the same make and model of aircraft, did not apply to CFIs. Although the policy explicitly required CFIs to possess the above qualifications, appellants assert that the policy imposed new conditions not present in the binder.
 
 
 23
 Michigan law applies in this diversity action. See, e.g., Harrow Prods., Inc. v. Liberty Mut. Ins. Co., 64 F.3d 1015, 1019 (6th Cir.1995). Under Michigan law, courts interpret an insurance policy by looking at the policy as a whole and giving meaning to all terms. See Advance Watch Co., Ltd. v. Kemper Nat'l Ins. Co., 99 F.3d 795, 799 (6th Cir.1996). Courts must construe ambiguous terms in the light most favorable to the insured. See id. at 800. Nonetheless, courts also must "enforce the terms of an insurance contract as written, and may not read into an insurance policy a nonexistent ambiguity; when the terms of a policy are plain and unambiguous, their plain meaning should be given effect." Valassis Communications, Inc. v. Aetna Cas. & Sur. Co., 97 F.3d 870, 873 (6th Cir.1996)(citing Upjohn Co. v. New Hampshire Ins. Co., 438 Mich. 197, 476 N.W.2d 392, 397 (1991)). Whether the terms of a contract are ambiguous is a question of law subject to de novo review. See Boyer v. Douglas Components Corp., 986 F.2d 999, 1003 (6th Cir.1993).
 
 
 24
 "An insurance binder is a contract of temporary insurance to be effective insurance coverage until a formal policy is drafted and issued. It is not a complete contract in a sense, but is evidence of the existence of a contractual obligation to be expressed in complete written form at a later date." State Auto. Mut. Ins. Co. v. Babcock, 54 Mich.App. 194, 220 N.W.2d 717, 721 (1974)(quoting Carideo v. The Phoenix Assurance Co. of New York, 317 F.Supp. 607, 610 (E.D.Pa.1970)). "[T]he rights and liabilities of the parties pursuant to the insurance binder are determined by reference to the conditions of the policy expected to be issued." Blekkenk v. Allstate Ins. Co., 152 Mich.App. 65, 393 N.W.2d 883, 885 (1986); see also Babcock, 220 N.W.2d at 722 (holding the same). Specifically,
 
 
 25
 "In the absence of an express agreement, the terms and conditions of such a temporary contract of insurance are those of the policies ordinarily used by the insurance company to cover similar risks, such as terms and conditions relating to cancellation, limitation of actions, and proofs of loss."
 
 
 26
 In other words, all ordinary provisions and exclusions of policies issued to cover similar risks will be read into the temporary binder, unless there was an express agreement at the time of the issuance of the binder which would make such provisions and exclusions inconsistent with the intent of the binder agreement.
 
 
 27
 Harmon v. American Interinsurance Exch. Co., 39 Mich.App. 145, 197 N.W.2d 307, 309 (1972)(quoting 43 AM.JUR. 2 D Insurance § 219 (1969))(emphasis added).
 
 
 28
 The claim by appellants that the binder did not require CFIs to log twenty-five hours in the same "make and model" of aircraft rests upon the fallacious assumption that because the binder did not refer explicitly to CFIs when imposing its requirements, it therefore imposed no requirements on CFIs. As the District Court noted, "one cannot reasonably conclude from this silence that coverage is provided whenever a certified flight instructor is flying the plane, without any further qualifications." Although appellants insist that the policy contained terms substantively different than those in the binder, the policy merely clarified that the requirements for CFIs were actually more lenient than those imposed upon other pilots who were not the insureds.
 
 
 29
 Moreover, the provision in the binder entitled "Minimum Pilot Requirements" declares the following:I/We understand and acknowledge that there is no coverage in flight unless the aircraft is being operated by the pilot(s) designated on this document who has/have at least the certificate ratings and pilot experience indicated and who is/are properly qualified for the flight involved.[2]
 
 
 30
 Accordingly, coverage only occurs if a designated pilot with the required experience was flying the plane. Because the binder contains no special section explicitly designating CFIs as proper operators, and because the "Special Pilot Provisions" clearly do not apply to CFIs, coverage can occur when a CFI was piloting the plane only if the "Open Pilot Provisions" include CFIs. The existence of coverage therefore hinges upon the very fact which appellants are attempting to disprove: that the "Open Pilot Provisions," and the attendant requirements, apply to CFIs.
 
 
 31
 Although appellants assert that the requirement of specifically twenty-five logged hours in the same make and model plane is not a standard requirement under the policy, the parties do not contest that the imposition of some requirements upon CFIs is a standard condition. Because a binder implicitly contains all of the ordinary provisions and exclusions of a policy unless the parties expressly agreed to the contrary, see Harmon, 197 N.W.2d at 309, appellants cannot insist that they reasonably believed that the policy failed to impose any requirements upon CFIs.
 
 
 32
 The Huffman estate, however, also has proceeded on the alternative theory that Myers was piloting the plane.[3] As noted, the "pilot requirements endorsement" of the policy, which conditions coverage upon "the pilot of the aircraft meet[ing] all the requirements specified herein," imposes the following requirements if John Myers was piloting the plane:
 
 
 33
 John Myers, a private or commercial, single-engine land rated pilot to receive 15 hours of dual instruction in the insured aircraft by a FAA certified single-engine land flight instructor prior to solo in the insured aircraft.
 
 
 34
 This specific provision does not declare explicitly that the CFI who was training Myers had to satisfy the twenty-five hour requirement, detailed in the next paragraph, applicable to all CFIs actually piloting the plane. Accordingly, Huffman argues that there is an ambiguity as to whether coverage exists when Myers was piloting the plane while receiving training from a CFI who had no qualifications other than FAA certification.
 
 
 35
 It simply would be unreasonable, however, to conclude that the policy might provide coverage if Myers was piloting the plane while receiving training from a CFI who would not have been a qualified trainer if he himself had been piloting the plane. Such a conclusion would defeat the purpose of requiring CFIs to have a minimal degree of experience specific to the insured aircraft, and would suggest that it is unimportant under the policy to have a qualified CFI, a person capable of flying the plane if problems develop, in the plane when the student is flying during instruction. We likewise reject this conclusion because it is unreasonable to assume that the policy allows coverage to turn on the fortuity of which man happened to be piloting the plane at the time of the crash, given that training is a collaborative effort. Although we must construe policies in the light most favorable to the insured, we cannot accept an interpretation which, although conceivable, is unreasonable. See Harrow Prods., 64 F.3d at 1022-1025 (theoretically possible interpretation cannot create ambiguity if interpretation is illogical in light of entire policy and reasonable expectations of parties); cf. Comerica Bank v. Lexington Ins. Co., 3 F.3d 939, 942 (6th Cir.1993)(policy is ambiguous only if susceptible to more than one reasonable interpretation).
 
 B.
 
 36
 The Myers estate and Colwell next argue that a genuine issue of fact exists regarding whether Huffman qualified under the policy because he actually logged twenty-five hours in the same "make and model" of aircraft. They claim that the phrase "make and model" is ambiguous, and emphasize that Phyllis Huffman and one Dennis Palmer have stated that Huffman had flown more than twenty-five hours in a single-engine Piper Comanche, even if not the specific model of Comanche here. Even assuming, however, that "make and model" is ambiguous, and that the statements by Phyllis Huffman and Palmer create an issue of fact regarding the number of hours which the decedent spent flying a single-engine Piper Comanche, we must reject this argument because the record contains no evidence that Huffman logged twenty-five hours in a plane which possibly qualified as the same make and model as the craft at issue.
 
 
 37
 The policy requires a CFI instructing an insured to have "flown and logged at least 25 hours in the same make and model as the insured aircraft." Further, it defines "logged pilot flying hours" as "those flying hours actually recorded in a logbook that were actually acquired as a pilot-in-command, or as co-pilot if a co-pilot was required by the Federal Aviation Regulations, or while taking dual instruction in an aircraft from a Certified Flight Instructor." The contract therefore demands a written log of hours flown, and appellants have not introduced such evidence.
 
 
 38
 We note that the binder stated only "25M&M" and did not require explicitly that those hours be recorded in a logbook. As explained, however, Michigan law dictates that the ordinary provisions and exclusions of the policy control unless the parties reached an express agreement identifying those provisions and exclusions as inconsistent with the intent of the parties. See Harmon, 197 N.W.2d at 309. Although appellants argue that they did not expect the requirements imposed by the policy in light of their understanding of the binder, there is no evidence of an express agreement which specifically precluded the explanation in the policy that flight hours must be logged.[4] Indeed, the binder provides that "the terms and conditions of this application and the policy currently in use by the insurers shall be the basis of any contract between me/us and the insurance company." NAS therefore may deny coverage on the basis that Huffman never recorded in a log book that he had flown twenty-five hours in the same make or model of aircraft. See id. at 310 (usual and ordinary definition in policy of term "full coverage" barred coverage, even though parties had different understandings of meaning of term, when parties had not agreed expressly to enter contract without that usual definition); see also Matousek v. South Dakota Farm Bureau Mut. Ins. Co., 450 N.W.2d 236, 239-40 (S.D.1990)(when policy issued after fatal accident contained exclusion not present in binder, exclusion barred coverage because it was standard and usual term of policy and binder failed to clearly and expressly supersede usual terms of policy); Babcock, 220 N.W.2d at 722 (quoting with approval the principles described in Harmon ).
 
 C.
 
 39
 The Myers estate and Colwell argue that the District Court erred by refusing to consider the report of Robert Hughes, an asserted expert in the interpretation of insurance contracts. After correctly noting that inadmissible evidence cannot preclude a motion for summary judgment, see FED.R.CIV.P. 56(e); Wiley v. United States, 20 F.3d 222, 226 (6th Cir.1994), the District Court found that the report of Hughes was not admissible under FED.R.EVID. 702 because Hughes was attempting to decide a legal question which only courts could decide. The court therefore refused to accept the report, stating that it would not "assist the trier of fact to understand the evidence or to determine a fact in issue."
 
 Federal Rule of Evidence 702 provides:
 Rule 702. Testimony by Experts
 
 40
 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
 
 
 41
 FED.R.EVID. 702.
 
 
 42
 "Absent any need to clarify or define terms of art, science, or trade, expert opinion testimony to interpret contract language is inadmissible." TCP Indus., Inc. v. Uniroyal, Inc., 661 F.2d 542, 549 (6th Cir.1981); but cf. CMI-Trading, Inc. v. Quantum Air, Inc., 98 F.3d 887, 890 (6th Cir.1996)(expert opinion as to whether parties had intended to enter lending or joint venture relationship was not admissible under Rule 702 as "scientific, technical or other specialized knowledge"); Innes v. Howell Corp., 76 F.3d 702, 711-12 (6th Cir.1996)(expert could not testify as to whether parties intended to enter attorney-client relationship).
 
 
 43
 Our analysis of the binder and policy has not required us to interpret any ambiguous provisions or confusing technical terms. The Myers estate and Colwell therefore cannot rely upon the report of Hughes to avoid summary judgment. See TCP Indus., 661 F.2d at 549-50 (error to admit expert testimony when "the witness was not testifying about a technical term which needed explaining").[5]
 
 D.
 
 44
 The Myers estate and Colwell argue that, even if the contract bars coverage for the accident, Charles Wenk made representations about the scope of coverage to Colwell which should estop him from invoking the written terms of the contract.[6] They further argue that NAS is likewise estopped because Wenk acted as its agent.
 
 
 45
 In Michigan, the doctrine of equitable estoppel applies when "a party, by representations, admissions, or silence intentionally or negligently induces another party to believe facts, the other party justifiably relies and acts on that belief, and the other party will be prejudiced if the first party is allowed to deny the existence of those facts." Soltis v. First of Am. Bank-Muskegon, 203 Mich.App. 435, 513 N.W.2d 148, 152 (1994). When estoppel is based upon an alleged promise, the promise must be definite and clear. See, e.g., Charter Township of Ypsilanti v. General Motors Corp., 201 Mich.App. 128, 506 N.W.2d 556, 559 (1993); Marrero v. McDonnell Douglas Capital Corp., 200 Mich.App. 438, 505 N.W.2d 275, 278 (1993). Whether there are sufficient facts to create an issue regarding the applicability of equitable estoppel is a question of law. See J.C. Wyckoff & Assocs., Inc. v. Standard Fire Ins. Co., 936 F.2d 1474, 1493 (6th Cir.1991)(citing Anderson v. Sanders, 14 Mich.App. 58, 165 N.W.2d 290, 292 (1968)).
 
 
 46
 In an affidavit, Colwell asserts the following:
 
 
 47
 [P]rior to and/or at the time of entering into the insurance binder/contract, Charles Wenk ... expressly informed me that coverage would exist if said aircraft were to crash while either John Myers or myself was receiving flight instruction from/with a CFI.
 
 
 48
 At a prior deposition, however, Colwell stated that Wenk actually made an even more narrow representation to him:Q. Did [Wenk]--my question was: Did he specifically tell you that any CFI would be covered as an insured under the policy so long as he had a CFI certificate from the FAA?
 
 
 49
 A. That's what I understood.
 
 
 50
 Q. Did he say that to you?
 
 
 51
 A. In those words?
 
 
 52
 Q. Yes.
 
 
 53
 A. No.
 
 
 54
 Q. How did he put it to you?
 
 
 55
 A. Any--you need to fly 15 hours dual with a Certified Flight Instructor. I took that to mean that, if I'm flying with a flight instructor in accordance with the insurance policy, I'm covered.
 
 
 56
 This deposition testimony of Colwell reveals that Wenk did not declare specifically that coverage would exist whenever a CFI was flying the plane. Rather, he merely reiterated a clear requirement already contained in the binder: the insureds had to fly fifteen hours with a CFI. Wenk therefore made no statement, much less a "clear and definite" promise, which could have created a reasonable belief by Colwell that, contrary to the terms of the binder and the policy, the contract imposed no requirements upon CFIs. See Marrero, 505 N.W.2d at 278 (employer was not estopped from relying on statute of frauds to deny existence of employment contract when employer only told plaintiff that he "would be taken care of;" further, estoppel did not apply when plaintiff admitted that alleged promise of a location in Puerto Rico was his own interpretation of a conversation, not a statement by employer).
 
 
 57
 The Myers estate and Colwell cite Industro Motive Corp. v. Morris Agency, Inc., 76 Mich.App. 390, 256 N.W.2d 607 (1977), in which the doctrine of estoppel prevented an insurer from relying upon the written terms of a policy to deny coverage. In Transamerica Ins. Corp. of Am. v. Buckley, 169 Mich.App. 540, 426 N.W.2d 696 (1988), the Michigan Court of Appeals described Industro Motive:
 
 
 58
 In that case, an insurance agent told the insured that coverage identical to that provided under another insurance company's policy could be obtained at a lower rate. The insured was given a written binder by the agent describing protection identical to that provided under the other insurance company's policy and the insured relied on the agent's representations in canceling its existing policy and purchasing the new coverage through the agent. This Court found that the insured was entitled to rely on the terms of the written binder, and thus that the insurer was estopped from denying liability under the terms of the written binder, until alerted to deviations from those terms in the provisions of the insurance policy itself.
 
 
 59
 Buckley, 426 N.W.2d at 699. The Buckley court distinguished the holding of Industro Motive from the facts before it, ruling that estoppel did not prevent the insurer there at issue from enforcing the terms of its policy when its agent had told the insureds that they were "all covered" for their insurance needs. See id.
 
 
 60
 This case is distinguishable from Industro Motive because Wenk neither made statements nor provided written materials inconsistent with the terms of the actual policy. Conversely, this case is similar to Buckley because Wenk merely made a general comment regarding coverage which was entirely consistent with the policy. Accordingly, the doctrine of estoppel does not apply in this case.
 
 E.
 
 61
 The Myers estate and Colwell frequently argue that Charles Wenk arranged for the disappearance of the log books of Arthur Huffman, and imply that Wenk altered the log books or the policy. Although appellants currently argue that the disappearance of the log books estops Wenk and NAS from invoking the written terms of the policy,[7] the District Court did not address this claim, and it is unclear whether appellants included their claim regarding the log books in their fraud count, contract count, proposed negligence count, or even regarded it as an independent tort not identified in their third-party complaint. Regardless of how they characterize the significance of their argument, however, the record cannot sustain the assertion that Wenk took or altered the log books.
 
 
 62
 The Myers estate and Colwell assert that Nicholas D. Chaffee, the owner of North Country Aviation, where the log books of Huffman were kept, testified during his deposition that Thomas Weiss, a CFI, took the log books after the crash but before NAS issued the policy.[8] They further assert that Chaffee testified that:
 
 
 63
 [Weiss] said that ... he talked to his insurance guy, which I assumed was Wenk, and that he said it would be better ... that the logbooks not be found, but that if ... anyone ever asked him, he'd deny it.
 
 
 64
 They therefore conclude vaguely that this testimony compels the application of estoppel.
 
 
 65
 The above testimony cannot create a genuine issue of material fact because it is inadmissible hearsay. See Wiley, 20 F.3d at 226 (courts cannot consider hearsay when reviewing motion for summary judgment); see also Hartsel v. Keys, 87 F.3d 795, 799 (6th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 683, 136 L.Ed.2d 608 (1997)(holding the same); Moore v. Holbrook, 2 F.3d 697, 699 (6th Cir.1993)(noting that Fed. R. Civ. P. 56(e) requires affidavits presented during summary judgment to set forth facts which would be admissible at trial). Although the Myers estate and Colwell correctly note that parties may resist a summary judgment motion by presenting evidence not in an admissible form, such as an affidavit, the evidence itself still must be admissible. See Treff v. Galetka, 74 F.3d 191, 195 (10th Cir.1996). Accordingly, the testimony of Chaffee is inadmissible hearsay and therefore cannot defeat a motion for summary judgment.
 
 
 66
 The Myers estate and Colwell assert that they do not offer the testimony of Chaffee in order to prove the truth of the matter asserted, "i.e., that Wenk[ ] told Weiss to dispose of the logbooks," but rather for other purposes, such as showing the fraudulent intent of Wenk. This claim is without merit. Appellants invoke the testimony of Chaffee to show estoppel or fraud, and proof of these claims necessarily depends upon appellants proving that Wenk in fact requested Weiss to dispose of or procure the log books for deceitful purposes.
 
 
 67
 Even if the testimony of Chaffee was admissible, it cannot create a genuine issue of fact. Chaffee merely testified that Weiss told him that someone, whom Chaffee assumed to be Charles Wenk, stated that it would be "better" if the log books disappeared. This remark, standing alone, cannot support a claim that Wenk in fact altered the log books, especially given the affidavit of Weiss stating that he never made such comments to Chaffee and that Wenk never told him to do anything with the books. To the extent that appellants may be claiming that Wenk altered the policy once he saw the log books of Huffman, we already have determined that the unambiguous provisions of the binder and the usual and ordinary terms of the policy imposed the very conditions which appellants may be accusing Wenk of creating.
 
 F.
 
 68
 The Myers estate and Colwell also argue that appellees are estopped from denying coverage because they delivered the policy "outrageously late."[9] Citing to testimony by Walter Weber, an underwriter for NAS, that NAS tries to issue a policy between five to ten working days after having issued a binder, the Myers estate and Colwell assert that appellants violated industry standards by taking approximately two months to provide a copy of the policy.
 
 
 69
 We initially note that the accident actually occurred less than a month after the insureds completed their application.[10] Regardless, we echo the conclusion of the District Court: "no case cited by Myers and Colwell, and no case of which this court is aware, imposes a duty on an insurer to deliver the policy promptly where the policy is already in effect; there is no general duty to comply with industry standards." Ultimately, the Myers estate and Colwell are complaining that the insureds would have sought more insurance before flying with an unqualified CFI if they had received a copy of the policy and thereby realized that it imposed conditions on coverage when a CFI was flying the plane. Our prior determination that the binder unambiguously imposed restrictions upon CFIs, however, dictates that any delay in delivering the policy did not deprive the insureds of an opportunity to discover this fact.
 
 G.
 
 70
 Finally, the Myers estate and Colwell assert that the District Court abused its discretion by denying their motion for leave to amend their counter- and third-party complaints. In their motion, appellants proposed to allege new claims of negligence and estoppel against all appellees, basing their proposed claims on the alleged statement by Wenk that coverage would exist if a CFI were flying the plane, and on the allegedly untimely receipt of the policy. The District Court denied the motion, finding that the amendments would be futile because the proposed claims were destined to fail.
 
 
 71
 We already have addressed and rejected the arguments upon which appellants based their proposed amendments. We therefore agree with the District Court that the amendments were futile. Because we have found that the parties' contract did not provide coverage for the accident at issue, and that appellants have not committed fraud or any other act which would prevent them from relying upon the written terms of the contract, we will not address whether the policy provided more than $100,000 in coverage for each decedent, or whether Charles Wenk acted as the "agent" of NAS.
 
 III.
 
 72
 For the reasons stated, we AFFIRM the rulings of the District Court.
 
 
 
 [1]
 Although the Myers estate brought cross-claims against Colwell and Huffman, these claims are not currently at issue
 
 
 [2]
 The parties' binder reveals that both insureds initialed the space next to the "Minimum Pilot Requirements" provision in order to indicate that they had read it
 
 
 [3]
 If Myers was the pilot, and if all conditions were satisfied at the time of the accident, then NAS would have a duty to defend and indemnify the Myers estate and Colwell against any claims against them by the Huffman estate. When disposing of the final motion for summary judgment by NAS as to Count I in its complaint, the District Court did not discuss whether the policy still might provide coverage if Myers, rather than Huffman, was the pilot
 
 
 [4]
 Nothing in the record suggests that the definition of logged pilot flying hours, contained in a boiler-plate section of the policy which defines standard terms, is anything other than a provision which NAS ordinarily employs
 
 
 [5]
 Appellees argue that we should review the ruling of the District Court for an abuse of discretion because it rested upon a finding that Hughes' report could not assist the trier of fact to understand the evidence or facts. See Cook v. American Steamship Co., 53 F.3d 733, 738 (6th Cir.1995). We note that if the District Court actually made a legal conclusion that expert testimony as to contractual terms is not a subject of "scientific, technical, or other specialized knowledge" under Rule 702, we would apply de novo review. See id. Regardless of which standard of review applies, however, our conclusion remains the same
 
 
 [6]
 This argument assumes that the insureds contracted with Wenk, as opposed to NAS only. Myers and Colwell also attempted to amend their third-party complaint in order to allege a negligence count against Wenk, based on his alleged representations. See infra
 
 
 [7]
 As noted, the assertion that estoppel applies to NAS assumes that NAS is responsible for the actions of Wenk
 
 
 [8]
 The log books subsequently reappeared
 
 
 [9]
 Although the District Court addressed this claim for the purposes of the liability of NAS when disposing of the summary judgment motions, Myers and Colwell reasserted this argument when moving for leave to amend to allege negligence and estoppel claims
 
 
 [10]
 On November 18, 1992, Wenk issued the application, which the insureds completed and signed on November 23, 1992. On November 28, 1992, NAS signed the policy, and issued the pilot requirements on December 1, 1992. The accident occurred on December 19, 1992. Wenk mailed the policy to Colwell on January 7, 1993