RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0122p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

LaTanya L. Wyatt,

　　　　　　　　*Plaintiff-Appellant*,

*v.*

Nissan North America, Inc.,

　　　　　　　　*Defendant-Appellee*.

> No. 20-5021

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:17-cv-01545—Eli J. Richardson, District Judge.

Argued: December 4, 2020

Decided and Filed: May 28, 2021

Before: MOORE, COOK, and STRANCH, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Douglas B. Janney III, LAW OFFICE OF DOUGLAS B. JANNEY III, Nashville, Tennessee, for Appellant. Stanley E. Graham, WALLER LANSDEN DORTCH & DAVIS, LLP, Nashville, Tennessee, for Appellee. **ON BRIEF:** Douglas B. Janney III, LAW OFFICE OF DOUGLAS B. JANNEY III, Nashville, Tennessee, for Appellant. Stanley E. Graham, Frederick L. Conrad III, WALLER LANSDEN DORTCH & DAVIS, LLP, Nashville, Tennessee, for Appellee.

　　　MOORE, J., delivered the opinion of the court in which STRANCH, J., joined. COOK, J. (pp. 31–37), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge.  Plaintiff LaTanya Wyatt, a Project Manager in Defendant Nissan's Information Systems Application Department ("IS Department"), appeals the district court's grant of Nissan's motion for summary judgment as to Wyatt's various employment discrimination and retaliation claims, under Title VII of the Civil Rights Act (Title VII), 42 U.S.C. § 2000e et seq., the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq. Wyatt argues that she has presented sufficient evidence from which a jury could find that Nissan subjected Wyatt to a hostile work environment due to unabated sexual harassment from a senior manager, discriminated against Wyatt because of her disabilities, and retaliated against Wyatt after she engaged in protected activity.  The district court failed to view the record in the light most favorable to Wyatt, leading it to conclude erroneously that there were no genuine issues of material fact with respect to Wyatt's hostile-work-environment claim brought under Title VII and retaliation claims brought under Title VII, the ADA, and the FMLA.  Therefore, for the reasons explained below, we **AFFIRM** the district court's grant of summary judgment to Nissan with respect to Wyatt's discrimination claim under the ADA and Wyatt's retaliation claims, insofar as they are based on retaliatory harassment.  We **REVERSE** the district court's grant of summary judgment to Nissan with respect to Wyatt's hostile-work-environment claim and Wyatt's retaliation claims based on adverse employment actions and **REMAND** for further proceedings consistent with this opinion.

**I.  BACKGROUND**

Wyatt began working for Nissan as a project manager in its IS Department in February 2013.  By 2015, she began reporting to IS Manager William Davis, who remained her supervisor for the years at issue.  For Wyatt's first two years as a project manager, she received positive annual performance reviews, earning "above" or "meets expectations" in all ten assessed categories.  R. 70-6 (Petty Ex. 2) (Page ID #1492); R. 70-6 (Petty Ex. 3) (Page ID #1494).  Each performance review highlighted her technical skills but also noted that Wyatt needed to

strengthen her project managing skills. During these same two years, Wyatt twice requested and received medical leave. At the end of each leave, Nissan restored Wyatt to her project manager position. When Wyatt returned from her second leave in April 2015, Nissan also granted nearly all the work accommodations recommended by Wyatt's doctor. R. 69 (Pl.'s Resp. to Def.'s Statement of Facts at 6–7) (Page ID #880–81).**1**

Unfortunately, Wyatt's return in 2015 marked the beginning of Wyatt's troubles at Nissan. Wyatt began working on a project (the "ABC project") headed by Walter Mullen, a senior manager at Nissan. Mullen began making inappropriate comments toward Wyatt on several occasions. On September 2, 2015, Mullen escalated his harassment. After Mullen invited and drove Wyatt to lunch, Mullen stopped at a hotel along the way under the pretense of showing Wyatt a suite his homeowner's insurance company was paying for while Mullen had his floors redone. R. 74 (Def.'s Resp. to Pl.'s Statement of Facts at 4) (Page ID #2068). Wyatt reluctantly agreed to go inside. *Id.* When they arrived at the room, Wyatt alleges that Mullen sexually harassed and assaulted her: he made sexual comments, exposed his genitals to Wyatt, asked if Wyatt wanted to touch them, prevented Wyatt from leaving the room, and tried to embrace her. *Id.* at 4–5 (Page ID #2068–69). Wyatt attempted to leave, told Mullen to stop, and became visibly upset throughout this ordeal. *Id.* at 5 (Page ID #2069). But Mullen placed his hand on the door and prevented Wyatt from leaving. *Id.* Mullen ultimately allowed Wyatt to leave, apologized, and asked her to ride back to Nissan with him. *Id.* Shocked, scared, and confused, Wyatt rode back with him to the office, which was about a mile away. *Id.* at 5–6 (Page ID #2069–70).

Wyatt attempted to avoid Mullen after the hotel incident, but he continued to seek her out. Around the week of September 22, Wyatt approached Mullen and told him how

---

**1**The U.S. District Court for the Middle District of Tennessee's Local Rule 56.01(b) requires a party moving for summary judgment to set out a concise statement of material facts as to which the party contends there is no genuine issue for trial. The party opposing the motion for summary judgment must respond to each fact by either (1) agreeing the fact is undisputed; (2) agreeing the fact is undisputed for purposes of ruling on the summary judgment motion; or (3) by demonstrating the fact is disputed with a specific citation to the record. *Id.* at (c). The nonmoving party may also set forth additional disputed facts, as to which the non-movant contends there exists a genuine issue to be tried. The moving party must then file a reply to each of those additional disputed facts. *Id.* at (d).

uncomfortable he made her. R. 70-4 (Wyatt Ex. 17 HR Notes at 2) (Page ID #1225). Mullen apologized and "said it would never happen again." *Id.* Soon after this incident, Mullen asked Davis to remove Wyatt from the ABC project, and Davis removed Wyatt from the project on October 1, 2015. R. 74 (Def.'s Resp. to Pl.'s Statement of Facts at 6) (Page ID #2070). Davis told Wyatt it was because Mullen informed Davis that Wyatt's performance was unsatisfactory. *Id.* at 7 (Page ID #2071). However, in November, Mullen approached Wyatt to discuss her removal from the project. Mullen denied that he said anything negative and told Wyatt he asked for Davis to remove Wyatt because Mullen needed a project manager that could devote more time to the project. *Id.* During October, despite Wyatt's attempts to avoid Mullen, he continued to touch Wyatt and rub down her shoulders to her buttocks, even though Wyatt asked Mullen to stop. *Id.* at 3, 7–8 (Page ID #2067, 2071–72).

On or about November 10, 2015, Wyatt reported Mullen's unwelcomed touching, but not the hotel incident, to another manager, David Butler. *Id.* at 9 (Page ID #2073). Butler asked Wyatt if he could escalate the issue to HR, which Butler did on November 19, 2015. *Id.* at 9–10 (Page ID #2073–74). On December 1, 2015, Wyatt, overwhelmed by Mullen's unabated groping, reached out to HR on her own initiative, asking if she could discuss some concerns. R. 70-4 (Wyatt Ex. 17 HR Notes at 2) (Page ID #1225). HR did not interview Butler until December 2, 2015. R. 74 (Def.'s Resp. to Pl.'s Statement of Facts at 11) (Page ID #2075). HR also interviewed Wyatt on December 3, 2015, and Wyatt disclosed all of Mullen's harassment, including the hotel incident. *Id.* Mullen remained in the workplace until December 9, 2015, when Nissan interviewed him regarding the allegations and then walked him out of the office. *Id.* at 12 (Page ID #2076). HR recommended his termination on December 10, 2015, which was approved on December 11, 2015, but Mullen resigned on December 13, 2015, before his termination could be effected. R. 70-6 (Petty Ex. 12 Recommendation for Termination) (Page ID #1542).

On December 8, 2015, Wyatt took medical leave for back surgery and did not return to work until May 2016. Upon her return, she and her doctors requested workplace accommodations, very similar to the ones she requested when she last returned from medical leave in May 2015. R. 69 (Pl.'s Resp. to Def.'s Statement of Facts at 6–7) (Page ID #880–81);

R. 74 (Def.'s Resp. to Pl.'s Statement of Facts at 18–19) (Page ID #2082–83). However, Nissan refused to accommodate her request for a forty-hour work week. R. 74 (Def.'s Resp. to Pl.'s Statement of Facts at 24) (Page ID #2088). Wyatt also asserts that Davis and HR Manager Lance Petty harassed her about her requested accommodations. *Id.* at 19–20 (Page ID #2083–84).

After Wyatt's return in May 2016, Davis met with Wyatt to discuss her performance for fiscal year 2015. First, on or about June 11, 2016, Davis gave Wyatt her first ever "below expectations" annual performance evaluation, citing concerns about her performance on several projects, including the ABC project. R. 69 (Pl.'s Resp. to Def.'s Statement of Facts at 4) (Page ID #878); R. 74 (Def.'s Resp. to Pl.'s Statement of Facts at 21) (Page ID #2085). On June 15, 2016, Davis met with Wyatt and issued her a Manager's Performance Improvement Expectations ("MPIE") for her performance over the past year, although Davis had made the decision to issue the MPIE and drafted it in December 2015. R. 69 (Pl.'s Resp. to Def.'s Statement of Facts at 5) (Page ID #879); R. 74 (Def.'s Resp. to Pl.'s Statement of Facts at 22–23) (Page ID #2086–87). An MPIE provides notice of unsatisfactory performance to an employee so that they can correct issues prior to receiving disciplinary action. On June 27, 2016, Wyatt filed a charge of discrimination with the EEOC, which was served on Nissan on June 30, 2016, and read by Davis shortly after. R. 74 (Def.'s Resp. to Pl.'s Statement of Facts at 23–24) (Page ID #2087–88). Subsequently, in January 2017, Davis issued Wyatt a 90-day Performance Improvement Plan ("PIP"), asserting that Wyatt's performance had not improved. R. 69 (Pl.'s Resp. to Def.'s Statement of Facts at 5) (Page ID #879); R. 74 (Def.'s Resp. to Pl.'s Statement of Facts at 26) (Page ID #2090). Wyatt refused to sign the PIP because she disagreed with his assessment and believed that it was retaliatory. R. 74 (Def.'s Resp. to Pl.'s Statement of Facts at 26) (Page ID #2090). Finally, in February 2017, Wyatt took medical leave and has continued to be on leave. *Id*.

Wyatt filed a complaint against Nissan, alleging, inter alia, a hostile-work-environment claim under Title VII, a failure-to-accommodate claim under the ADA, and retaliation claims under Title VII, the ADA, and the FMLA. Discovery proceeded, and Nissan filed a motion for summary judgment. The district court granted summary judgment in favor of Nissan on all of

Wyatt's claims. *Wyatt v. Nissan North Am.*, *Inc.*, No. 3:17-cv-1545, 2019 WL 6682197, at *18 (M.D. Tenn. Dec. 6, 2019). Wyatt appealed.

## II. ANALYSIS

### A. Standard of Review

"We review a grant of summary judgment de novo." *Thaddeus-X v. Blatter*, 175 F.3d 378, 385 (6th Cir. 1999) (en banc). Summary judgment is a granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a). "[W]e will reverse a grant of summary judgment if the nonmoving party has presented evidence of specific facts, which, viewed in the most favorable light, indicates that there is a genuine issue for trial." *Thaddeus-X*, 175 F.3d at 385. In making this determination, we must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### B. Hostile-Work-Environment Claim

Under Title VII, to establish a prima facie hostile-work-environment claim, Wyatt must show: "(1) she was a member of a protected class; (2) she was subjected to unwelcomed harassment; (3) the harassment was based on sex[]; (4) the harassment created a hostile work environment; and (5) employer liability." *Ladd v. Grand Trunk Western R.R.*, 552 F.3d 495, 500 (6th Cir. 2009). Only the last two elements are in dispute.

#### 1. Establishing a Hostile Work Environment

Harassment creates a hostile work environment "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)). The conduct must be "severe or pervasive enough to create an

objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive." *Id.* When assessing whether conduct has become objectively severe or pervasive, the Supreme Court has instructed courts to consider a nonexhaustive list of factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. We are more likely to conclude that conduct is pervasive when the sexually harassing conduct is continuous and not sporadic. *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 334 (6th Cir. 2008). And our precedent makes clear that "harassment involving an 'element of physical invasion' is more severe than harassing comments alone." *Id.* (quoting *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 563 (6th Cir. 1999)).

Wyatt's allegations concerning Mullen's persistent harassment fall squarely within the scope of what our circuit considers severe or pervasive conduct. Wyatt's contemporaneous notes detail the ongoing unwelcome physical touches by Mullen that occurred for at least three months. Despite Wyatt's requests for Mullen to stop, Mullen continually "rub[bed] [her] back," and "rub[bed] down her backside every chance he [got]." R. 70-4 (Wyatt Ex. 17 HR Notes 1–3) (Page ID #1224–26). She noted that Mullen "continue[d] to try and touch [her] everytime [sic] he sees [her]." *Id.* at 3 (Page ID #1226). Although Nissan characterizes the hotel incident as a simple "unwelcome proposition," Appellee's Br. at 17, Wyatt described the experience as Mullen taking her to a hotel room under false pretenses and then sexually propositioning her and exposing his genitals to her, after Wyatt asked to leave and opposed Mullen's solicitations. Wyatt's allegations of the explicit solicitation, the unwanted display of Mullen's genitals, and the ongoing sexual harassment, especially the continued physical invasions, set forth sufficient facts to survive summary judgment, even if she does not recount many specific instances. *See Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 252 (6th Cir. 1998) (noting that when a plaintiff alleges ongoing harassment, the "inability to recount any more specific instances goes to the weight of [plaintiff's] testimony, a matter for the finder of facts").

A determination that an employee's harassment has created a hostile work environment also requires that the plaintiff "subjectively perceive[s] the environment to be abusive." *Harris*,

510 U.S. at 21. Although we agree with the district court that Wyatt sufficiently established this element, we pause to correct the district court's improper fact-finding regarding this component. The district court erroneously focused on irrelevant facts when it found that Wyatt's claim was "somewhat undermined by the fact that she waited three months to report the hotel room incident and she also chose to go to lunch alone with Mullen again two months after that incident." *Wyatt*, 2019 WL 6682197, at *5 n.8. Our concern is not whether Wyatt voluntarily associated with Mullen but whether Wyatt "by her conduct indicated that the alleged sexual advances were unwelcome." *Meritor Sav. Bank*, 477 U.S. at 68. Furthermore, we do not require that a plaintiff report a hostile work environment to establish that she subjectively perceived her work environment to be hostile. *Williams*, 187 F.3d at 566. Wyatt's notes show that she opposed Mullen's solicitations both in the workplace and at the hotel and repeatedly asked him to stop touching her because it made her uncomfortable. When Wyatt felt overwhelmed by Mullen's continued harassment, she reported Mullen's conduct to a manager and to HR directly. A jury reasonably could find that Wyatt established that Mullen's conduct was unwelcome, that Wyatt regarded her environment as hostile or abusive, and that Mullen's ongoing harassment made it more difficult for Wyatt to do her job. *See Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 349 (6th Cir. 1988), *cert. denied*, 490 U.S. 1110 (1989). Accordingly, although we correct the district court's analysis, we agree with the district court that Wyatt presented sufficient evidence to raise a genuine issue of material fact as to whether Mullen's conduct created a hostile work environment.

## 2. Establishing Employer Liability

Under Title VII, once a plaintiff establishes that they experienced a hostile work environment, we determine an employer's liability for the harassing employee's conduct based on the status of the harasser. When the plaintiff's harasser is a co-worker, we apply a heightened negligence standard. *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). However, if the harasser is a supervisor, we apply a more stringent standard. "If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable." *Id.* But if the harassment does not result in a tangible employment action, "the employer may escape liability by establishing" an affirmative defense under the *Faragher-Ellerth* framework. *Id.* (citing

*Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)). Often, courts will be able to resolve the status of the harasser as a matter of law before trial. But when there are genuine factual disputes about whether an alleged harasser qualifies as a co-worker or a supervisor, a plaintiff can proceed under both theories. *Id.* at 443–44. The parties contest whether Mullen qualifies as a supervisor. Thus, we must first evaluate if Wyatt has presented sufficient evidence to raise a genuine issue of material fact as to whether Mullen qualifies as a supervisor. Only then can we evaluate whether her claim survives summary judgment under both the supervisor liability standard and the co-worker liability standard.

### a. Supervisor Status

Nissan argues that Mullen does not qualify as a supervisor. For Title VII liability purposes, the Supreme Court defines a "supervisor" as an employee that has the power "to take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.* at 431 (quoting *Ellerth*, 524 U.S. at 761). Neither party disputes that Mullen did not have the actual authority to take tangible employment actions against Wyatt. But our inquiry does not stop there. The Supreme Court recognized that a company's hierarchy and reporting structures may not be so easily delineated. In some cases, when "decisionmaking power" rests in the hands of "a small number of individuals, those individuals will have a limited ability to exercise independent discretion when making decisions and will likely rely on other workers who actually interact with the affected employee." *Id.* at 447. Due to that reliance, an employer "may be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies." *Id.*

Wyatt has put forth sufficient facts to show a genuine issue as to whether Davis had effectively delegated supervisory power to Mullen. Wyatt testified that Mullen was in her "chain of command" and that when she worked on Mullen's project, she directly reported to him. R. 70-2 (Wyatt Dep. at 177–78) (Page ID #1024–25). Wyatt also described how managers for her projects, including Mullen, would report to Davis for her performance reviews and that Davis

received all of his "data and information, and direction" from the managers responsible for her projects. *Id.* at 178, 180 (Page ID #1025, 1027). Although the record does not conclusively reveal whether Davis interacted with Wyatt every day, the record shows that Davis did not actively participate in the management of the projects assigned to Wyatt, including the projects that Mullen managed. Davis also admitted that he had to take Mullen's recommendations into account, and, at least when it came to removing managers off projects, Davis acceded to any request made by Mullen. R. 70-8 (Davis Dep. at 58–59) (Page ID #1688–89). These indicia of reliance and authoritative input sufficiently show a genuine issue of material fact as to whether Davis substantially relied on Mullen's recommendations when taking tangible employment actions. *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 509 (7th Cir. 2004) (Rovner, J., concurring in part and concurring in judgment) ("Although they did not have the power to take formal employment actions vis-à-vis [the victim], [the harassers] necessarily must have had substantial input into those decisions, as they would have been the people most familiar with her work . . . ."), *cited favorably by Vance*, 570 U.S. at 447; *see also Kramer v. Wasatch Cnty. Sheriff's Off.*, 743 F.3d 726, 741 (10th Cir. 2014) ("In contrast to a coworker who can only cause a demotion or a pay cut through some elaborate scheme, a supervisor who lacks the direct power to impose tangible employment consequences can accomplish the same easily, without scheming . . . .") (citations and internal quotations omitted). Thus, we must assess whether Wyatt has established a basis for imposing employer liability under either the supervisor theory of liability or the co-worker theory.

### b. Supervisor Liability

Because Mullen's harassment did not result in Nissan taking a tangible employment action against Wyatt, we next consider whether Nissan has established an affirmative defense under the *Faragher-Ellerth* framework. Nissan must show that (1) it "exercised reasonable care to prevent and correct any harassing behavior" and (2) that Wyatt "unreasonably failed to take advantage of the preventive or corrective opportunities" that Nissan provided. *Vance*, 570 U.S. at 424. Nissan loses the affirmative defense if it fails either prong.

The first element involves evaluating whether Nissan had a "reasonable sexual harassment policy" and whether such policy "was effective in practice." *Clark v. United Parcel*

*Serv., Inc.*, 400 F.3d 341, 349–50 (6th Cir. 2005). Wyatt does not dispute that Nissan's sexual harassment policy was reasonable. Instead, Wyatt argues that the district court erred in finding that Nissan promptly investigated and corrected the alleged sexual harassment. Appellant's Br. at 30. We agree.

The district court erred in its analysis by considering only Nissan's conduct after Wyatt reported the harassment to HR on December 3, 2015. Even though the court noted that Wyatt reported the harassment to Butler (who then made a report to HR on November 19, 2015), it found that pertinent only when considering how Wyatt acted unreasonably. *Wyatt*, 2019 WL 6682197, at *7 n.13. The court failed to use the same timeline when considering whether Nissan acted unreasonably.**[2]**

Nissan argues that it did not know of the alleged behavior until Wyatt reported it to Butler on November 19, 2015, and that Wyatt argues for the first time on appeal that she reported the harassment to Butler on November 10, 2015. This is blatantly false. In her response to Nissan's motion for summary judgment, Wyatt clearly states that she reported Mullen's harassment to Butler "on or about November 10, 2015." R. 68 (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 4) (Page ID #852). Under our circuit's caselaw "[a]n employer is deemed to have notice of harassment reported to any supervisor or department head who has been authorized . . . to receive and respond to or forward such complaints to management." *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 277 (6th Cir. 2009). Under Nissan's policy, Butler, as a manager, clearly falls within the category of supervisors authorized to receive and report complaints to management. *See* R. 70-7 (Petty Ex. 24 at 2) (Page ID #1618). Thus, Nissan had notice of Mullen's harassment no later than November 10, 2015.

Starting from November 10 as the date of notice paints an entirely different picture of Nissan's investigation and corrective actions. It took Butler *nine* days to report Wyatt's complaint to HR. But Nissan's policy requires that managers *immediately* notify HR upon

---

**[2]**A very generous reading might attribute this to Wyatt not mentioning the hotel incident to Butler; however, Butler certainly viewed Wyatt's concerns as serious enough to escalate to HR (which he was nonetheless required to do under Nissan's sexual harassment policy). *See* R. 70-11 (Butler Dep. at 18–20) (Page ID #1850–52); R. 70-7 (Petty Ex. 24 at 2) (Page ID #1618).

receiving a harassment complaint. *Id*. Once Butler reported the harassment to HR, HR did not reach out to Butler or Wyatt until December 2, when HR met with Butler. HR Manager Petty did not recall why HR did not meet with Butler in November, except that he could only "assume that the . . . Thanksgiving holiday and availability played somewhat into that." R. 70-5 (Petty Dep. at 115) (Page ID #1344). Notably, on December 1, Wyatt herself reached out to HR and asked if they could discuss some concerns. Petty had no answer for what HR did between November 19 through December 1 to investigate the complaint. *Id.* at 113 (Page ID #1342). Petty also testified that from November 19 through December 2, Nissan took no remedial action to prevent Mullen from sexually harassing Wyatt. *Id*. However, Wyatt's notes show that Mullen continued to harass Wyatt after her report to Butler on November 10. After speaking to Wyatt on December 3, HR did not meet with Mullen until December 9, at which time he corroborated some of Wyatt's allegations concerning his harassing conduct at the hotel. R. 70-6 (Petty Ex. 12 Recommendation for Termination) (Page ID #1540–41). Nissan did not remove Mullen from the workplace or separate him from Wyatt until December 9, 2015. In sum, after Wyatt reported the harassment, Nissan waited *twenty days* to take any investigative steps and *twenty-eight days* before it separated Mullen from Wyatt. Viewing the evidence in a light most favorable to Wyatt and drawing all reasonable inferences in her favor, we conclude that Nissan's three-week delay in investigating an explicit and specific sexual harassment complaint suffices to defeat summary judgment and send the question of whether Nissan acted with reasonable care for resolution by a factfinder. *Cf. Fenton v. HiSAN, Inc.*, 174 F.3d 827, 830–31 (6th Cir. 1999) (holding that the employer was not liable because the manager immediately relayed the complaint to HR the day it was reported and the employer met with the harasser and separated him from the plaintiff five days later); *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 407 (6th Cir. 1997) (concluding that the employer took prompt and adequate action in part because plaintiff "admit[ted] that there were no incidents of sexual harassment after she made her complaint").

The dissent argues that "Nissan need not act perfectly," especially considering Wyatt's two-month delay in complaining about any harassment.**[3]** Dissent at 32. But it fails to explain

---

**[3]**We note that the dissent cites *Foster v. Board of Regents of University of Michigan* as support for how we should assess reasonableness for Title VII claims. 982 F.3d 960, 968 (6th Cir. 2020) (en banc); Dissent at 32. But in *Foster*, we addressed a Title IX claim, which required us to assess the defendant's actions under a deliberate

why we should view as *reasonable* Nissan's three-week delay in taking any investigative steps. Nissan's sexual harassment policy compels us to conclude that there is at least a genuine dispute as to whether it was reasonable for Butler to delay nine days in reporting Wyatt's sexual harassment complaint when Nissan's policy requires that managers immediately notify HR upon receiving a complaint. Furthermore, Wyatt's actions distinguish her case from *EEOC v. AutoZone, Inc.*, when we held that an employer's two-week delay in beginning any investigative steps was not unreasonable because the plaintiff's complaints were "vague[]" and "nebulous." 692 F. App'x 280, 285 (6th Cir. 2017) (per curiam). Wyatt complained to Butler about specific instances of unwanted physical contact that Butler considered to be inappropriate. Nissan's three-week delay in investigating explicit allegations of unwanted physical invasions creates a question of reasonableness that should be resolved by a jury.

Alternatively, under the second prong, Wyatt has set forth sufficient evidence to establish a genuine issue of material fact as to whether Wyatt unreasonably failed to take advantage of any preventative or corrective measures Nissan provided. In evaluating a plaintiff's conduct, we look at how and when a plaintiff uses the company's existing corrective and protective measures. *See, e.g.*, *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 457 (6th Cir. 2008) (concluding that a plaintiff acted unreasonably in part because after years of escalating harassment, she did not report the harassment until two months after taking a leave of absence); *AutoZone*, 692 F. App'x at 286 (concluding that a plaintiff unreasonably failed to take advantage of corrective opportunities when she waited two months to report harassment and her allegations were vague and nonspecific). Although Wyatt waited until two months after the hotel incident to report Mullen's harassing behavior, a jury could find that Wyatt reasonably delayed reporting the hotel incident due to the lack of witnesses corroborating her allegations. Furthermore, Wyatt's notes and testimony demonstrate that Mullen's comments and behavior made her fear negative employment consequences if she "[did not] give in to his sexual advances." R. 70-6 (Petty Ex. 13) (Page ID #1548). Wyatt testified that directly after she rebuffed his advances in the hotel,

---

indifference standard. *Id.* at 965. A deliberate indifference standard "presents a 'high bar' to imposing Title IX liability," a bar that we have never held to apply when assessing an employer's actions under *Faragher/Ellerth* in Title VII employment discrimination cases. *Id.* (quoting *Stiles ex rel. D.S. v. Grainger County*, 819 F.3d 834, 848 (6th Cir. 2016)).

Mullen reminded Wyatt that "to move up at Nissan, . . . it's not what you know, it's who you know" and Wyatt "need[ed] somebody like [Mullen] on [her] corner." R. 70-3 (Wyatt Dep. at 333–34) (Page ID #1180–81). With Mullen serving as a senior manager "and about to be appointed to a director," Wyatt feared that if she reported him, she could lose her job. *Id.* at 334 (Page ID #1181). The evidence demonstrates that Wyatt "was under a credible threat of retaliation" that alleviated her duty to report Mullen's behavior, particularly when coupled with Mullen's swift removal of Wyatt from the ABC project after she complained to Mullen about his behavior. *Thornton*, 530 F.3d at 457 (quoting *Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1290–91 (11th Cir. 2003) (per curiam)); *see Shields v. Fed. Exp. Customer Info. Servs. Inc.*, 499 F. App'x 473, 483 (6th Cir. 2012) (holding that "[a] reasonable jury could accept the plaintiffs' testimony that they interpreted [the alleged harasser's] comments as credible threats of retaliation to keep them quiet"). Considering all the facts and circumstances, we conclude that the record establishes a genuine issue of material fact as to whether Wyatt had credible reasons for her delay in pursuing other reporting avenues. *See Shields*, 499 F. App'x at 482 ("[T]here may be reasons why the plaintiff failed to complain to those other than the harasser, who are listed as available. And in such cases, a genuine issue of fact may be raised as to whether it was reasonable not to pursue other options." (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 105 (2d Cir. 2010))).[4]

Despite these rational fears, Wyatt did not remain silent in the face of continued harassment. Instead, Wyatt reported specific allegations to Butler, who was required to escalate the matter to HR. When Wyatt's conversation with Butler did not appear to yield any results, Wyatt also reached out to HR on her own initiative. Wyatt even returned to Nissan after taking medical leave without Nissan giving her any indication that her situation had been remedied. *Cf. Thornton*, 530 F.3d at 457 (holding that it was unreasonable for the plaintiff to reject a measure

---

[4]The dissent references an earlier part of Wyatt's testimony in coming to its conclusion that Wyatt suffered from only subjective fears of retaliation. Dissent at 33. But the dissent fails to note the context in which Wyatt discussed her statement that "black women . . . do not tell." R. 70-3 (Wyatt Dep. at 324) (Page ID #1171). In that same paragraph, Wyatt clarified that she felt that Mullen sexually harassed her because "he knew or felt that he knew [Wyatt] wasn't going to say anything." *Id.* at 324–25 (Page ID #1171–72). This part of her testimony did not address why she delayed in reporting Mullen's harassment. Instead, Wyatt testified that she felt that Mullen sexually harassed her because *he* believed that, based on her position as a black woman in a corporate setting, she would not feel comfortable reporting him. *Id.*

that "was reasonably designed to eliminate the complained-of stressors").  Viewing the record in a light most favorable to Wyatt, we conclude that a jury reasonably could find that Wyatt did not unreasonably fail to take advantage of the available procedures to report Mullen's conduct.

Based on either prong, Nissan cannot benefit from the affirmative defense at the summary judgment stage because it failed to show that there are no genuine issues of material fact regarding whether it acted reasonably in preventing and correcting harassment and whether Wyatt acted unreasonably in utilizing the preventative and corrective measures that Nissan provided.  Consequently, the district court erred in finding that Nissan had established both prongs of the defense.  We hold that Wyatt's hostile-work-environment claim under a supervisor liability theory survives summary judgment.

### c. Co-Worker Liability

Wyatt has also put forth sufficient evidence to survive summary judgment under a theory of co-worker liability.  For a plaintiff to hold an employer liable for the harassing conduct of an employee's co-workers, the plaintiff "must show that the employer's response to the plaintiff's complaints 'manifest[ed] indifference or unreasonableness in light of the facts the employer knew or should have known.'"  *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 814 (6th Cir. 2013) (quoting *Hawkins*, 517 F.3d at 338).  Once Wyatt told Butler about Mullen's unwelcome touching on November 10, 2015, Nissan had constructive notice, which obligated it to begin taking prompt and appropriate remedial measures.  A reasonable jury could conclude from the evidence that Nissan failed to take promptly a number of steps that would be necessary to "establish a base level of reasonably appropriate corrective action," such as Butler immediately escalating the issue to HR, HR promptly reaching out to Wyatt and Butler, and HR following up with Wyatt regarding whether the harassment was continuing.  *West v. Tyson Foods, Inc.*, 374 F. App'x 624, 633 (6th Cir. 2010).  The fact that Nissan accelerated its investigation after speaking to Wyatt on December 3 does not excuse its dilatoriness after her earlier complaint on November 10.  Consequently, we conclude that Wyatt has shown genuine issues of material fact concerning the reasonableness of Nissan's response to her sexual harassment complaint.  We hold that Wyatt's hostile-work-environment claim may also proceed under a co-worker theory of employer liability.

**C. Disability-Discrimination Claim**

The ADA prohibits discrimination against a qualified individual because of their disability. Because Wyatt alleges that Nissan discriminated against her because of her disability by failing to offer a reasonable accommodation, we analyze her claim under the direct-evidence framework, which requires that Wyatt establish that (1) she "is disabled," and (2) that she is "'otherwise qualified' for the position despite . . . her disability: (a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation." *Fisher v. Nissan North Am., Inc.*, 951 F.3d 409, 417 (6th Cir. 2020) (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007)). In turn, "Nissan bears the burden of 'proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon' Nissan." *Id.* (quoting *Kleiber*, 485 F.3d at 869). Nissan does not dispute that Wyatt is disabled; therefore, the sole issue on appeal is whether Wyatt is "otherwise qualified" for her position despite her disabilities.[5]

Nissan contends that Wyatt was not a "qualified individual" because her request to work forty hours a week eliminated an essential function of the job and therefore was per se unreasonable.[6] Appellee's Br. at 31–34. In contrast, Wyatt argues that instead of asking for an essential function to be eliminated, she sought only a temporary modified work schedule, which would be a "proposed reasonable accommodation." Appellant's Br. at 51. "In failure-to-accommodate claims where the employee requests an 'accommodation that *exempts* her from an essential function,' 'the essential functions and reasonable accommodation analyses run together.' One conclusion (the function is essential) leads to the other (the accommodation is not reasonable)." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 763 (6th Cir. 2015) (en banc) (quoting

---

[5]Nissan also argues that this claim is time-barred because it first denied her request to have a forty-hour work week in 2015, which was more than 300 days before Wyatt filed her EEOC charge. Appellee's Br. at 29–31. It is unclear whether Nissan did deny the request in 2015. Even assuming that Nissan did deny the request, both the 2015 and 2016 denials were "discrete discriminatory act[s]" and Wyatt challenges only the 2016 denied request, which occurred after a different medical leave than the 2015 denied request. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). Therefore, Wyatt's challenge is not time-barred. *Id.*

[6]Neither party disputes that Nissan accommodated her other requests, Appellant's Br. at 53, so only the forty-hour work week accommodation is at issue.

*Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1240 (9th Cir. 2012)). Thus, Wyatt's claim cannot survive summary judgment if the ability to work more than forty hours per week is essential to the project manager position.

Overall, Nissan has put forth sufficient uncontroverted evidence to show that working more than forty hours per week is an essential function of Wyatt's position. In assessing whether a job function is essential, courts may consider several factors, including the employer's judgment, the consequences of not requiring the employee to perform the function, and the current work experience of employees in similar jobs. 29 C.F.R. § 1630.2(n)(3); *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 854–55 (6th Cir. 2018). Davis explained that due to the required functions of Wyatt's position, such as working with vendors that operate outside of the U.S., "[t]here are times in which it is necessary to conduct business activities outside of a normal 40 hour workweek." R. 70-7 (Petty Ex. 18 Draft Resp. to Accommodation Request) (Page ID #1594); R. 70-9 (Davis Dep. at 141) (Page ID #1771). Although Davis did not know the average amount of hours every project manager worked, he knew that at least half of them work an average of forty-five to fifty hours a week. R. 70-9 (Davis Dep. at 151–52) (Page ID #1781–82).

Wyatt argues that working only forty hours is possible if Nissan gave her reasonable projects, R. 70-1 (Wyatt Dep. at 112–13) (Page ID #976–77), but her own testimony and other record evidence contradicts this assertion. For example, Wyatt testified that salaried employees were expected to work as much as necessary to complete a project and that the nature of the job often required project managers to be available at night, early in the morning, and over weekends. R. 70-3 (Wyatt Dep. at 34–36) (Page ID #1144–46). Perhaps most telling is an email from Wyatt to Davis where Wyatt asks Davis to "reduce [her] hours down to 40hrs until [she was] back healthy and ready for 60, 70, 80 hour work weeks since that is what [Davis was] used to seeing from [her]." R. 70-10 (Davis Ex. 6 Wyatt Email at 3) (Page ID #1822). Clearly, Wyatt had a history of working more than forty hours to manage her projects. According to Davis's testimony, Nissan attempted to lighten Wyatt's load upon her return, but Wyatt claimed it took her sixty to seventy hours to do "roughly 85 to 90 percent of what a person should be able to do." R. 70-9 (Davis Dep. at 147–48) (Page ID #1777–78). Despite this evidence, Wyatt claims that the accommodation is reasonable because Nissan previously granted the forty-hour

accommodation in 2014 and 2015. But she points to no evidence establishing that Nissan granted the request. Appellant's Br. at 51. And Nissan continues to contend that it never granted such a request. Appellee's Br. at 30. On this record, Wyatt has failed to show that a per se limitation to a forty-hour work week allowed her to perform the essential functions of her job.

Finally, Wyatt argues that her request was reasonable because it would only require "temporarily spreading 5 hours of work per week among numerous other projects managers." Appellant's Br. at 53. However, the ADA does not require employers "to assign existing employees or hire new employees to perform certain functions or duties of a disabled employee's job which the employee cannot perform by virtue of [her] disability." *Bratten v. SSI Servs., Inc.*, 185 F.3d 625, 632 (6th Cir. 1999). In short, because Nissan has shown that it is essential that project managers be available to work more than forty hours a week, Wyatt's failure-to-accommodate claim must fail. Accordingly, the district court properly granted summary judgment to Nissan on Wyatt's failure-to-accommodate ADA claim.

## D. Retaliation Claims

Wyatt also brought retaliation claims under Title VII, the ADA, and the FMLA. The prima facie case for retaliation under all three statutes is practically identical. A plaintiff must demonstrate that (1) they engaged in a protected activity, (2) the employer knew of the exercise of the protected right, (3) the employer took adverse employment action against the plaintiff or subjected the plaintiff to severe or pervasive retaliatory harassment by a supervisor, and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. *See Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 792–93 (6th Cir. 2000); *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007); *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997). In the retaliation context, the term "adverse employment action" encompasses more than just actions that affect "the terms, conditions or status of employment." *Hawkins*, 517 F.3d at 345. It includes any conduct "that would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)). Furthermore, we have consistently held that the plaintiff's burden at the prima facie stage "is minimal" and easily met. *E.E.O.C. v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997). Once a plaintiff

establishes a prima facie case, "the defendant has a burden of *production* to articulate a nondiscriminatory reason for its action. If the defendant meets its burden, the plaintiff must prove the given reason is pretext for retaliation." *Ford Motor Co.*, 782 F.3d at 767 (internal citation omitted).

### 1. Title VII Retaliation

Wyatt asserts that "[s]he engaged in protected activity [under Title VII] when she (1) opposed Mullen's sexual harassment to Mullen; (2) reported it to a manager, Butler, on November 10, 2015; (3) reported it to HR on December 3, 2015; (4) reported it to an attorney who reported it to Nissan's HR on January 12, 2016; and (5) filed an EEOC charge on June 27, 2016." Appellant's Br. at 37–38. She also asserts that Nissan subjected her to adverse employment actions when it "(1) removed her from [the ABC project] on October 1, 2015; (2) completed a premature MPIE for her in December 2015, while she was on medical leave; (3) completed a 'below expectations' performance review for her in April 2016, while she was still on medical leave; and (4) placed her on a PIP in January 2017." *Id.* at 38. On appeal, Nissan challenges for the first time whether the ABC project removal and "below expectations" review are adverse actions.[7] Because Nissan never argued and the district court did not consider whether the alleged adverse actions were in fact adverse employment actions, Nissan is precluded from raising such arguments on appeal. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 676 (6th Cir. 2013), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013). Thus, the only disputed issues that we will consider are whether Wyatt can establish causation, whether Nissan can proffer a nondiscriminatory reason for its actions, and whether Wyatt can show that such reason is pretextual.

---

[7]Nissan also contends that Wyatt never argued to the district court that her below-expectations review was an adverse employment action. Appellee's Br. at 45 n.5. This assertion does not stand up against Nissan's own motion for summary judgment which clearly states that Wyatt "claims retaliation took the form of Davis rating her as below expectations on her FY 2015 Annual Performance Evaluation." R. 55 (Def. Mem. in Support of Mot. for Summ. J. at 13) (Page ID #398). This is just one of several assertions by Nissan attempting either to discredit Wyatt or to have her forfeit an argument that is blatantly contradicted by the record.

### a. Adverse Employment Actions

### i. October 2015 Project Removal

In her response to Nissan's motion for summary judgment, Wyatt did not allege that Davis, the ultimate decisionmaker, retaliated against Wyatt because she opposed Mullen's sexual harassment. Instead, Wyatt alleged that Mullen, the head of the ABC project, was biased against her and caused Davis to remove her from the project. Because it depends on proving that a biased lower-level supervisor influenced the ultimate decisionmaker, Wyatt's claim of retaliation depends on the cat's paw theory of liability. "A plaintiff alleging liability under the cat's paw theory seeks 'to hold [her] employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision.'" *Marshall v. Rawlings Company L.L.C.*, 854 F.3d 368, 377 (6th Cir. 2017) (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011)). We focus our inquiry on whether "another individual and not the actual decision maker 'is the driving force behind the employment action.'" *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1069 (6th Cir. 2015) (quoting *Roberts v. Principi*, 283 F. App'x 325, 333 (6th Cir.), *cert. denied*, 555 U.S. 996 (2008)). A plaintiff alleging retaliation based on the cat's paw theory of liability still must establish a prima facie case of retaliation and then prove that the decisionmaker was the cat's paw of the biased subordinate. Thus, we first address Wyatt's prima facie case by analyzing her claim that Mullen retaliated against her. If Wyatt establishes a prima facie case of retaliation, we will evaluate whether she has shown that Mullen was the driving force behind Davis's decision to remove her from the project.

The district court erred in finding that Wyatt's claim based on the October project removal "falls apart as a temporal matter" because Wyatt reported Mullen's behavior in December. *Wyatt*, 2019 WL 6682197, at *10. Wyatt's first protected activity, her opposing Mullen's sexual harassment, occurred throughout September 2015. Davis removed Wyatt from the ABC project on October 1, 2015, citing performance concerns from Mullen. The alleged adverse employment action occurred within weeks, if not days, of Wyatt's protected activity. That is sufficient temporal proximity to establish a causal connection. *See Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283–84 (6th Cir. 2012) (collecting cases holding that a two- to three-

month time lapse between a plaintiff's protected activity and occurrence of a materially adverse action is sufficient temporal proximity to satisfy a plaintiff's prima facie case of retaliation).

We have held that "[w]hen the employer 'proceeds along lines previously contemplated,' we must not take the temporal proximity of the adverse employment action as evidence of causality." *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 507 (6th Cir. 2014). "[B]ut if the adverse employment action is unlike the action previously contemplated or does not occur on the schedule previously laid out, then the temporal proximity of the adverse action to the protected conduct is certainly evidence of causation." *Id.* Although Wyatt does not dispute that Mullen raised concerns about her performance on the ABC project as early as July 2015, evidence in the record demonstrates that as recently as August 2015, Davis and Mullen did not contemplate removing Wyatt from the ABC project due to performance issues. Instead, Mullen and then Davis and Mullen met with Wyatt to discuss her responsibilities and the scope of the project. R. 70-4 (Wyatt Ex. 17 HR Notes at 1) (Page ID #1224). The takeaway was that the project's management was "fine" and, if necessary, Mullen would add another project manager to the project to handle its increase in scope. *Id.* A few days later, Wyatt opposed Mullen's sexual advances when he took her to his hotel room under false pretenses. *Id.* Three weeks later, she confronted Mullen again. One week later, Davis pulled her off the project, citing concerns from Mullen. Thus, despite the previous contemplation of Wyatt's performance issues, the abrupt change from the contemplated addition of another project manager to Wyatt's removal and its timing permit using the proximity of Wyatt's removal to her protected activity as evidence of a causal connection. *Montell*, 757 F.3d. at 508.

Because Nissan has offered a legitimate, non-retaliatory reason for its action—Wyatt's alleged poor performance on the project—Wyatt must put forth sufficient evidence to show a genuine dispute as to whether this reason is pretextual. To establish pretext, Wyatt must show that the legitimate nondiscriminatory reason (1) had no basis in fact; (2) did not actually motivate the adverse action; or (3) was insufficient to warrant her removal. *Ladd*, 552 F.3d at 502. Although a plaintiff cannot rest solely on temporal proximity to establish pretext, "suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence." *Seeger*, 681 F.3d at 285 (quoting *Bell v. Prefix, Inc.*, 321 F. App'x 423, 431 (6th Cir. 2009)).

Wyatt does not dispute that, at least as early as July 2015, Mullen reached out to Davis raising concerns about Wyatt's performance on the ABC project. Wyatt also does not dispute that Davis continued to receive complaints from Mullen and another team member. However, Wyatt argues that during the same period, Davis indicated that her overall performance was satisfactory. R. 70-8 (Davis Dep. at 82–85) (Page ID #1712–15); R. 70-9 (Davis Dep. at 86–89) (Page ID #1716–19). In addition, the record also contains conflicting evidence as to why Mullen asked Davis to remove Wyatt from the project. *See, e.g.*, R. 70-4 (Wyatt Ex. 17 HR Notes at 2) (Page ID #1225) (Mullen told Wyatt he needed a manager that could give more time to the project); R. 70-6 (Petty Ex. 12 Recommendation for Termination) (Page ID #1541) (Mullen told HR "he needed a project manager with a different style"). The suspicious timing coupled with the inconsistent explanations make it such that a trier-of-fact would need to weigh the evidence and make credibility determinations to decide whether Wyatt's performance on the project actually was poor and actually motivated her removal or whether Mullen retaliated against her for opposing his sexual advances. *See Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 320 (6th Cir. 2019) (holding that to survive summary judgment an employee does not have to prove pretext but only needs to "create a *genuine issue* as to whether the rationale is pretextual" (quoting *Whitfield v. Tennessee*, 639 F.3d 253, 260 (6th Cir. 2011))). On this record, a reasonable jury could find that Nissan's articulated reason for removing Wyatt was pretextual.

Wyatt has also demonstrated a genuine issue of material fact as to whether Mullen influenced Davis to remove Wyatt from the ABC project. The record is replete with evidence showing that Mullen was the "driving force" behind Davis's decision to remove Wyatt from the project. *See, e.g.*, R. 70-6 (Petty Ex. 12 Recommendation for Termination) (Page ID #1539–41); R. 70-8 (Davis Dep. at 72) (Page ID #1702). To the extent that Nissan argues that Davis, the ultimate decisionmaker, had a "good faith" belief that Wyatt "was not properly managing [the project]," Appellee's Br. at 38, such a belief is irrelevant when an employee proceeds under a cat's paw theory of liability. *Marshall*, 854 F.3d at 380. Furthermore, Nissan's argument that Davis's individual assessments of Wyatt's performance defeat her cat's paw claim also fails. Davis's sole action to investigate Mullen's claims was to sit in on "five or six calls" in Mullen's office, where Davis observed that Wyatt did not participate when it was "[Mullen's] expectation" that Wyatt would be running the calls. R. 70-9 (Davis Dep. at 170–71) (Page ID #1800–01).

Davis's assessment of Wyatt's performance while in the presence of the biased subordinate cannot serve as "an in-depth and truly independent investigation," *Marshall*, 854 F.3d at 380, that shows that "the adverse action was, apart from the supervisor's recommendation, entirely justified." *Staub*, 562 U.S. at 421. Consequently, a jury reasonably could conclude that Mullen influenced Davis's decision to remove Wyatt from the ABC project, making Davis the conduit for Mullen's retaliatory animus.

Because Wyatt has shown genuine issues of material fact as to whether Nissan retaliated against her when Davis removed her from the ABC project, Wyatt's retaliation claim based on the project removal as an adverse action survives summary judgment.

### ii. Negative Performance Evaluations

Wyatt has also put forth sufficient facts to survive summary judgment on her retaliation claim based on Davis issuing her negative performance evaluations. To start, the district court erred when it found that Davis did not have any knowledge of Wyatt's protected activity, as it relates to her Title VII claim, when Davis issued Wyatt's 2015 annual performance review and the MPIE in June 2016. The district court failed to construe the record in a light most favorable to Wyatt and blindly accepted Nissan's claim that Davis did not know that Wyatt complained about Mullen's conduct until Wyatt filed the EEOC charge on June 27, 2016. Appellee's Br. at 38.

Wyatt points to several pieces of evidence that belie this assertion. First, on December 3, 2015, HR interviewed Davis about Wyatt's removal from the ABC project. R. 70-6 (Petty Ex. 12 Recommendation for Termination) (Page ID #1539). This was the same day that Wyatt met with HR to discuss her complaints about Mullen's sexual harassment. Second, Davis testified that HR met with him sometime in late 2015 to discuss a complaint but "[he] was never told" who or what it was about. R. 70-8 (Davis Dep. at 63–68) (Page ID #1693–98). However, when pressed, Davis recalled that HR asked if he was aware of any "inappropriate behavior." *Id.* Davis also testified that, shortly after this meeting, in December 2015 he learned that Mullen was no longer at Nissan, but he never learned why Mullen left. *Id.* at 69–70 (Page ID #1699–1700). Third, Davis testified that he learned that Wyatt had reported her concerns about Mullen to an

attorney, which occurred in January 2016.  But when asked if Davis recalled when he learned this, Davis obfuscated and stated it occurred "when it happened."  R. 70-9 (Davis Dep. at 100–01) (Page ID #1730–31).

Additionally, Wyatt testified that before she came back from leave in May 2016, two co-workers told her that "Davis was upset that [she] had 'lied' on Walter Mullen."  R. 70-1 (Wyatt Dep. at 114–16) (Page ID #1015–17); R. 70-2 (Wyatt Dep at 171–72) (Page ID #1018–19).  The district court improperly dismissed this testimony as inadmissible hearsay evidence.  *Wyatt*, 2019 WL 6682197, at *9–10, n.15–16.   Unfortunately, the district court misapprehended the requirements of Federal Rule of Civil Procedure 56, which requires a plaintiff's evidence to be admissible only as to its contents and not as to its form, as long as the plaintiff can proffer that it will be produced in an admissible form.  *Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997).  Thus, "deposition testimony will assist a plaintiff in surviving a motion for summary judgment, even if the deposition itself is not admissible at trial, provided substituted oral testimony would be admissible and create a genuine issue of material fact."  *Id.* (holding that even assuming the out-of-court declarant testified at trial, rendering the otherwise inadmissible hearsay admissible, the plaintiff's deposition testimony still would not "raise a factual issue" that would allow the plaintiff to survive summary judgment on her retaliation claim); *see Bard v. Brown County*, 970 F.3d 738, 757 n.12 (6th Cir. 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (noting that the opposing party could rely on a deponent's testimony that rested on inadmissible hearsay from an out-of-court declarant to survive summary judgment because it was possible that the out-of-court declarant could testify at trial, which would cure the hearsay issue); *see also* FED. R. CIV. P. 56 advisory committee's note to 2010 amendment (explaining that once a party objects that "material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence," the burden shifts to "the proponent . . . to explain the admissible form that is anticipated").**8**

---

**8**The dissent takes issue with our conclusion that because Wyatt has sufficiently proffered that the hearsay evidence of her co-workers' statements will be produced in an admissible form, *i.e.*, through their direct testimony, at trial, we can consider what would otherwise be inadmissible hearsay evidence. Dissent at 35–36.  There have been cases where we refused to rely on hearsay testimony when considering whether an opposing party has survived summary judgment. *See id.* at 35 (collecting cases).  However, even prior to the Supreme Court's clarification in *Celotex* that the party opposing summary judgment need not "produce evidence in a form that would be admissible

There is no question that the testimony of Wyatt's co-workers would be admissible and create a genuine issue of material fact as to whether Davis knew about Wyatt's protected activity before June 2016. The district court's musings that "it is sheer speculation, based on the current record, that these co-employees actually would testify that Davis made the statements Plaintiff claims he made" were inappropriate and not substantiated. *Wyatt*, 2019 WL 6682197, at *9 & n.16. The court improperly foreclosed Wyatt from showing a genuine dispute as to whether Davis had knowledge of her protected activities before June 2016. Viewing the evidence in a light most favorable to Wyatt and drawing all reasonable inferences in her favor, we conclude that a jury could determine that Davis had knowledge of her protected activity in December 2015 when he drafted the MPIE, in April 2016 when he completed the 2015 annual review, and in early June 2016 when he issued the MPIE and the annual review.

We also conclude that Wyatt has established causation. The close temporal proximity of Wyatt's protected activities to Nissan's adverse actions by themselves may suffice to establish a causal connection. *See Seeger*, 681 F.3d at 283–84. The few days separating Wyatt's report of Mullen's conduct to HR and Davis drafting the MPIE constitutes evidence of causation. The three months between Wyatt's lawyer sending a letter to Nissan in January 2016 and Davis completing the 2015 annual review in April 2016 also establishes evidence of causation. Davis

---

at trial in order to avoid summary judgment," 477 U.S. at 324, our court has made similar inquiries into what an opposing party may be able to proffer in order to rely on hearsay evidence on a summary judgment motion. For example, in *Daily Press, Inc. v. United Press International*, the plaintiff attempted to show a genuine factual dispute by relying on hearsay evidence. 412 F.2d 126, 133 (6th Cir. 1969). We noted that the third-party declarant had actually testified and denied making the hearsay statement; thus, we concluded that the hearsay evidence "would not have been admissible." *Id.* Similarly, in *State Mutual Life Assurance Co. v. Deer Creek Park*, a party again attempted to use hearsay statements to defeat summary judgment, but we noted that the hearsay declarants were unwilling to testify voluntarily and were not deposed. 612 F.2d 259, 268 (6th Cir. 1979). Accordingly, we concluded that the district court did not have any reason to believe that any admissible evidence going to the dispute at issue would be forthcoming at trial. *Id.* We conducted a similar inquiry post-*Celotex* in *Jacklyn v. Schering-Plough Healthcare Products Sales Corp.*, 176 F.3d 921, 927–28 (6th Cir. 1999) (noting that because the third-party declarant denied making the alleged hearsay statements "hearsay is an issue"). Thus, the advisory committee's commentary for Rule 56 as well as Supreme Court and Sixth Circuit precedent support our conclusion that courts, in determining whether to consider hearsay evidence, may inquire as to whether the party opposing summary judgment is capable of producing an otherwise inadmissible hearsay statement in a form that will be admissible at trial, *i.e.*, via substituted oral testimony by the third-party declarant. *See also J.F. Feeser, Inc., v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir. 1990), *cert. denied*, 499 U.S 921 (1991) ("[H]earsay evidence . . . may be considered if the out-of-court declarant could later present the evidence through direct testimony, i.e., in a form that 'would be admissible at trial.'" (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 465 n.12 (3d Cir. 1989))); *Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996) (same); *JL Beverage Co. v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016) (same).

issued the PIP in January 2017, just six months after Wyatt filed her EEOC charge in late June 2016. In essence, Davis's continued and escalating negative performance reviews were adverse reactions to Wyatt's initial and subsequent protected activities. Moreover, Wyatt has alleged other indicia of retaliatory conduct. She testified that before she returned from leave in May 2016, Davis told employees that he was upset about Wyatt's complaint against Mullen. Wyatt also points to the fact that she had never before received a "below expectations" evaluation on a performance review (albeit these were done by other managers) and that Davis indicated that her overall job performance was satisfactory when she applied for a promotion in November 2015. Neither party disputes that her MPIE and 2015 evaluation covered only the time she worked in 2015, which was April through early December. These facts are sufficient "to meet the low threshold of proof necessary to establish a prima facie case of retaliatory discharge." *Id.* at 283.

Again, Nissan offers the same nondiscriminatory reason for the negative performance evaluations: Wyatt's continuous poor performance. As detailed earlier, Davis already had concerns about Wyatt's performance, at least on the ABC project, as early as July 2015. Wyatt does not dispute that as soon as Wyatt started reporting to Davis, he already had concerns about Wyatt's performance. Nissan also asserts that Davis honestly believed that Wyatt's performance was poor and that Davis reasonably relied on particularized facts when he issued her MPIE, 2015 performance review, and PIP. *See Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707–08 (6th Cir. 2006); *see, e.g.*, R. 56 (Wyatt Ex. 11 at 1) (Page ID #434); R. 70-7 (Petty Ex. 15 & 16) (Page ID #1581–86).

However, Nissan cannot enjoy the protection of the "honest belief" rule if Wyatt demonstrates pretext by showing that even if Davis held concerns about her performance, those concerns did not actually motivate Davis to issue the negative performance evaluations. *See Babb*, 942 F.3d at 323; *see also Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (holding that a plaintiff can prove pretext by arguing "that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext or coverup"), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). Wyatt points to several pieces of evidence that demonstrate that Davis did not honestly believe her performance was so poor as to merit these reviews.

Wyatt highlights that in late November 2015, Davis indicated that her performance was satisfactory when asked to give Wyatt's performance a rating in connection with a job application that Wyatt submitted. That undisputed evidence contradicts Davis's assertions that he found Wyatt's performance to be of such concern as to merit drafting an MPIE just a few days later in early December 2015 or to give "below expectation" scores for Wyatt's work during April 2015 to December 2015. When asked about this contradiction, Davis replied that he "personally will not impede anybody trying to do better for themselves," he "was not untruthful" when saying her performance was satisfactory, and moving her forward in the process "was the right thing to do." R. 70-9 (Davis Dep. at 87–89) (Page ID #1717–19). We find that explanation to be clearly inconsistent with a manager issuing performance evaluations that will impede an employee's ability to be promoted or receive bonuses. Taken in context with Wyatt's co-workers' statements that Davis was upset that Wyatt had "lied on" Mullen, these inconsistences become even more concerning.

Other evidence supports Wyatt's contention. Davis testified that he "got feedback from [Butler] about [Wyatt] and her performance" and that it was negative. R. 70-8 (Davis Dep. at 76) (Page ID #1706). But Butler stated that he "always had compliments that [he] provided . . . to [Wyatt's] management," and that he "didn't remember saying anything derogatory or negative to [Davis] or to his boss" about Wyatt. R. 70-11 (Butler Dep. at 31–34) (Page ID #1863–66). Davis also leans heavily on Mullen's concerns about Wyatt's performance on the ABC project. Despite these alleged concerns, when Wyatt approached Davis regarding her confusion as to why Davis removed her from the ABC project, Davis "told [her] not to worry about it." R. 70-4 (Wyatt Ex. 17 HR Notes at 3) (Page ID #1226). Additionally, Nissan's protocol does not allow a manager to issue an MPIE before an employee receives a "below expectations" on a performance review. But Davis drew up the MPIE in December 2015 before Wyatt ever received a "below expectations" review and allegedly right after Wyatt opposed Mullen's harassment to HR. Although Davis did not officially issue the MPIE until after he issued her 2015 annual review, which included several "below expectations" scores, the timing allows for some inference that retaliation was the more likely motivation than Davis's belief that Wyatt had consistently poor performance.

In sum, Wyatt has established genuine factual disputes as to whether Nissan's reason for giving her several negative performance evaluations was pretextual. *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 527 (6th Cir. 2008) ("Such inconsistency and evasiveness seem to be the epitome of pretext meant to mask retaliatory discrimination, at the very least raising a factual question for a jury to resolve."). Thus, we hold that the district court erred in finding that the performance evaluations do not sustain Wyatt's Title VII-retaliation claim. Wyatt's Title VII-retaliation claim based on all the alleged adverse employment actions survives summary judgment.

### b. Retaliatory Harassment

Additionally, Wyatt asserts that Nissan subjected her to retaliatory harassment between May 2016 through February 2017 due to her protected activities. Appellant's Br. at 38. "[T]he standard for actionable harassment is the same in the retaliation context as in the sexual . . . discrimination context[]." *Broska v. Henderson*, 70 F. App'x 262, 269 (6th Cir. 2003). Accordingly, Wyatt must demonstrate that the harassment was "sufficiently severe or pervasive to alter the conditions of the [her] employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (quoting *Meritor Sav. Bank*, 477 U.S. at 67). In considering the alleged retaliatory incidents, we conclude that, taken all together, they do not establish a hostile work environment. *See Broska*, 70 F. App'x at 269–70 (collecting cases). Most of Wyatt's allegations of harassment are based on Davis issuing her three negative performance evaluations over a six-month period. Wyatt also claims that Davis "overloaded her work." Appellant's Br. at 44. However, the evidence reflects that Nissan routinely had her working 60-80 hours a week prior to Wyatt engaging in any protected activities. Wyatt does not allege that Davis or any other supervisor physically intimidated her or verbally humiliated her. Nor does Wyatt allege that any of her supervisors consistently bothered her during work or while she was away from work. In short, Wyatt has not put forth sufficient evidence to show that Davis subjected Wyatt to severe or pervasive retaliatory conduct that "create[d] an objectively hostile or abusive work environment." *Harris*, 510 U.S. at 21–23. Therefore, we hold that a retaliatory harassment theory cannot sustain Wyatt's Title VII retaliation claim.

**2. ADA and FMLA Retaliation**

**a. Adverse Employment Actions**

Wyatt's ADA- and FMLA-retaliation claims closely mirror her Title VII-retaliation claim and survive for similar reasons. She again contends that the adverse employment actions were her negative performance evaluations. Appellant's Br. at 54. Wyatt returned from FMLA leave in May 2016 and began requesting reasonable accommodations in April and May 2016. Davis issued her negative 2015 annual review and MPIE in June 2016. The one- to two-month time lapse between the protected activities and the adverse actions suffices to establish a genuine issue as to causation. *See Seeger*, 681 F.3d at 283–84. The inconsistences surrounding Davis's drafting of the MPIE also suffice to show evidence of causation, especially considering that Davis knew in early December that Wyatt again would be taking vacation time to have surgery. *See* R. 70-9 (Davis Dep. at 98–99) (Page ID #1728–29); R. 70-10 (Davis Ex. 2) (Page ID #1807). As discussed *supra* in Section II.D.1.a.ii, Wyatt has established a genuine dispute as to whether Nissan's proffered nondiscriminatory reason for issuing her negative performance evaluations is pretextual. Wyatt's testimony that Davis told a co-worker she was "not to be treated like Princess Diana just because [she had] a disability" also supports viewing Nissan's reason as mere pretext. R. 70-3 (Wyatt Dep. at 349) (Page ID #1196). Although not sufficient on its own, the statement's negative animus increases the cumulative effect of all the inconsistencies to demonstrate a genuine dispute as to whether Wyatt's performance actually motivated Davis to issue her negative evaluations or if it is more likely than not that Davis retaliated against Wyatt because she took leave and then requested accommodations due to her disabilities. Consequently, we hold that Wyatt's ADA- and FMLA-retaliation claims based on Nissan's adverse employment actions also survive summary judgment.

**b. Retaliatory Harassment**

For the same reasons as discussed *supra* in Section II.D.1.b., Wyatt has not put forth enough evidence to show that Nissan subjected her to severe or pervasive retaliatory harassment because of protected activities she engaged in under the ADA or FMLA. Davis's "Princess Diana" comment, though inappropriate, cannot by itself be considered severe or pervasive.

Davis refusing to restrict her workload to a forty-hour workweek also cannot establish a showing of harassment as it was a per se unreasonable accommodation request. Additionally, Wyatt asserts that Davis harassed her continuously about her accommodations by repeatedly meeting with her and asking for unnecessary documentation. Appellant's Br. at 17–19. But Wyatt does not point to any specific incidents that do not relate to her discussions about changes in her accommodation requests or how many hours a week she had to work. Again, Wyatt has failed to set forth sufficient facts that demonstrate conduct that an objective person would consider as severe or pervasive retaliatory harassment due to her requesting accommodations for her disability or for taking medical leave. That theory cannot serve as a basis for allowing her ADA-and FMLA-retaliation claims to survive summary judgment.

### III.  CONCLUSION

For these reasons, we **AFFIRM** the district court's grant of summary judgment to Nissan with respect to Wyatt's discrimination claim under the ADA and Wyatt's retaliatory harassment claims under Title VII, the ADA, and the FMLA. We **REVERSE** the district court's grant of summary judgment to Nissan with respect to Wyatt's hostile-work-environment claim and Wyatt's retaliation claims based on adverse employment actions under Title VII, the ADA, and the FMLA, and we **REMAND** for further proceedings consistent with this opinion.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

COOK, Circuit Judge, concurring in part and dissenting in part. I would affirm the judgment of the district court in full. Because the majority reverses on some claims, I respectfully dissent in part.

## I. Title VII Hostile Work Environment

First, I agree that Wyatt's evidence raised a fact issue as to the existence of a hostile work environment. But Nissan showed its reasonable care to prevent and promptly correct the harassing behavior. It also showed that Wyatt unreasonably failed to take advantage of the measures in place. *See Vance v. Ball State Univ.*, 570 U.S. 421, 430 (2013) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)).

### A. Nissan's Reasonable Response

Nissan showed its reasonable care in maintaining a sexual harassment policy that "was effective in practice in reasonably preventing and correcting any harassing behavior." *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 349 (6th Cir. 2005). It showed that those implementing the policy "acted reasonably—in response to what they observed—to prevent and correct sexual harassment." *Id*. at 350.

The majority takes a different view, focusing on the twenty-eight days between Wyatt lodging her first complaint about Mullen's harassment and Nissan reprimanding him. But context shows Nissan responded reasonably. On November 10, Wyatt complained to David Butler that Mullen made her uncomfortable when he touched her shoulders and back, omitting the grievous aspect that he assaulted her and exposed himself in a hotel room two months prior. Within nine days, Butler forwarded Wyatt's complaint about the unwelcome touching to the company's human resources department. Before HR took any action, Wyatt contacted them herself to disclose for the first time the hotel room incident. From that point, Nissan quickened

its handling of her complaint. Within a week, HR interviewed and recommended terminating Mullen. He then resigned.

The majority reverses on its assessment that Nissan should have moved faster. But Nissan need not act perfectly. *See Deters v. Rock-Tenn Co.*, 245 F. App'x 516, 527 (6th Cir. 2007); *see also Foster v. Bd. of Regents of Univ. of Mich.*, 982 F.3d 960, 968 (6th Cir. 2020) (en banc) (evaluating a Title IX deliberate indifference claim: "What at any rate could the University have done differently? That's not the test of course. Else, strict liability would be the rule"). In *Deters*, we found that an employer acted reasonably despite its near two-month delay in remedying complaints of harassment, our court there rejecting the plaintiff's argument that her employer's response "was too slow." 245 F. App'x at 526–27. And similarly, in *EEOC v. AutoZone, Inc.*, we found an employer reasonably addressed and eliminated harassment though two weeks elapsed before the company acted on an initial vague complaint but accelerated its investigation after the employee got specific. 692 F. App'x 280, 285 (6th Cir. 2017) (per curiam). We explained: "[t]his is not a case where several supervisors observed and participated in harassment while ignoring the victims' complaints over months or years." *Id.* Neither is this.

Given that Wyatt waited two months to complain of any harassment and three months to disclose the hotel incident, Nissan's attending to this harasser's dismissal within a week of the hotel-incident report supports affirming rather than reversing.

## B.  Wyatt's Failure to Reasonably Report

Nissan also showed that Wyatt failed to reasonably avail herself of its preventive and corrective opportunities by waiting to report Mullen. *See Vance*, 570 U.S. at 430. This court finds similar reporting delays unreasonable. *See AutoZone, Inc.*, 692 F. App'x at 286 ("We have held that an employee unreasonably fails to take advantage of corrective opportunities when she waits two months to report harassment." (citing *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 457–58 (6th Cir. 2008))).

The majority excuses Wyatt's delay on the theory that she feared retaliation. But "an employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty . . . to alert the employer to the allegedly hostile environment." *Thornton*, 530

F.3d at 457 (citation omitted). And the whole point of requiring prompt reporting is to allow employers to implement curative measures.

That theory proceeds, focusing on Wyatt's eventual removal from the "ABC project" as evidencing a "credible threat," not just her own subjective fear. But Wyatt never argued that her removal from the ABC project motivated her delay. On the topic, she testified that she delayed reporting due to her subjective fears. (*See* R. 70-3 at PageID #: 1171 ("In my mind, I couldn't help but feel I, I can tell you from my perspective as a black woman; black women, we do not tell. . . . There is not a big enough support group in my mind."); *id.* at PageID #: 1181 ("What weight do I have? What if I go back and say he did that and he says no, I didn't; my job, my everything. . . . Like that's scary on every level to me.").) Of course, had Wyatt acted sooner, Nissan could have removed Mullen *before* he had the chance to recommend Wyatt's removal from the ABC project. *See Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1063–64 (10th Cir. 2009) ("Had [the employer] been notified earlier, there is a good chance that Title VII's primary goal of preventing harm would have been served."). No doubt Wyatt found herself in a tough spot after Mullen assaulted her; she and the majority show she feared reporting the incident. But her reporting delay—according to her testimony—stemmed from her belief in her powerlessness within this corporate setting, rather than some concern regarding imminent retaliation by Nissan. And of course, prompt notice to the employer is the method both the company and the law require for corrective action. Given the evidence here, Nissan's response sufficed to avoid liability and I would affirm the district court's dismissal of Wyatt's hostile-work-environment claim.[1]

## II. Retaliation

Next, as regards the retaliation claims, Wyatt fails to establish a prima facie case without some evidence supporting a connection between Nissan's desire to retaliate against Wyatt for engaging in a protected activity and a resulting adverse action. *See George v. Youngstown State*

---

[1]Nissan would also prevail if we viewed Mullen as Wyatt's coworker rather than her supervisor, because Nissan acted reasonably and liability for coworker harassment requires a showing of negligence. *See Vance*, 570 U.S. at 424.

*Univ.*, 966 F.3d 446, 459–60 (6th Cir. 2020); *Sharp v. Profitt*, 674 F. App'x 440, 451 (6th Cir. 2016).

### A. Title VII

For her Title VII claims, Wyatt first complains that Billy Davis retaliatorily removed her from the ABC project in October 2015 because she rejected Mullen's advances. She concedes that Davis lacked knowledge about any incidents between her and Mullen, so she relies on a "cat's paw" theory, requiring her to show that retaliatory animus motivated Mullen, her lower-level supervisor, to recommend to Davis, the decisionmaker, that he remove Wyatt from the project. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 418–19 (2011).

Without pointing to evidence that Mullen harbored such animus, the majority suggests that the temporal proximity between Wyatt rebuffing Mullen's advances and her removal from the project one month later suffices. Our cases undercut that view, holding that temporal proximity alone generally cannot establish causation. *See Adair v. Charter Cnty. of Wayne*, 452 F.3d 482, 490 (6th Cir. 2006) ("[T]hat the actions complained of followed the protected activity closely in time, standing alone, is insufficient to establish the causation element of a retaliation claim."); *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) (collecting cases). Indeed, when an employer merely proceeds along lines previously contemplated, "we must *not* take the temporal proximity of the adverse employment action as evidence of causality." *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 507 (6th Cir. 2014) (emphasis added); *see also Vereecke*, 609 F.3d at 401 (temporal proximity of six months "and the presence of an obviously nonretaliatory basis for the defendants' decision amount to insufficient evidence to permit an inference of retaliatory motive"); *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002) ("Evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity."). Here, Mullen complained to Davis about Wyatt's performance as early as July 2015, well before any protected activity took place.

For her remaining Title VII retaliation claims, Wyatt complains that Davis—after Mullen resigned—issued her a poor performance review in April 2016 and two formal

deficient-performance warnings: an "MPIE" (Manager's Performance Improvement Expectations) in early December 2015 and a "PIP" (Performance Improvement Plan) in January 2017.

In reviewing the evidence supporting these claims, the majority relies on inadmissible hearsay—Wyatt's testimony that her coworkers told her that Davis told them that he "was upset that [she] had 'lied' on Walter Mullen." It labels the district court's rejecting the hearsay as "[u]nfortunate[]" and "inappropriate," all while dismissing the bedrock law "that a court may not consider hearsay when deciding a summary judgment motion." *Tranter v. Orick*, 460 F. App'x 513, 514 (6th Cir. 2012) (collecting cases); *see also, e.g.*, *Pack v. Damon Corp.*, 434 F.3d 810, 815 (6th Cir. 2006) ("[H]earsay . . . may not be considered on a motion for summary judgment."); *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 620 (6th Cir. 2003) (same); *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999) (same); *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir. 1997) (same).

Yes, as the majority notes, courts at summary judgment may consider evidence not in "admissible *form*," such as affidavits or depositions, if its "*content* [is] admissible." *Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997). Testimony of Wyatt's coworkers would likely be admissible, but not *Wyatt's* testimony as to what she *heard* from her coworkers.

We've addressed this issue before. In *North American Specialty Insurance Co. v. Myers*, a party sought to avoid summary judgment by providing the following deposition testimony from witness Nicholas Chaffee: "[Weiss] said that . . . he talked to his insurance guy, which I assumed was Wenk, and that he said it would be better . . . that the logbooks not be found." 111 F.3d 1273, 1283 (6th Cir. 1997). We disregarded the evidence as inadmissible hearsay, declining to follow the same reasoning used by the majority here because "the evidence itself still must be admissible." *Id.* No material difference exists between Chaffee's hearsay testimony and Wyatt's hearsay testimony. *See also, e.g.*, *Stiles ex rel. D.S. v. Grainger County*, 819 F.3d 834, 846 (6th Cir. 2016) ("testimony . . . based on statements DS made to [the deponent] rather than her personal knowledge" constituted inadmissible hearsay, not subject to consideration at summary

judgment).  Wyatt presents textbook hearsay that courts must disregard.**2**  *See* Fed. R. Evid. 801(c), 802.

Viewing the admissible evidence, Wyatt's remaining claims fail.  For the MPIE that Davis prepared in December 2015, Wyatt cannot show that Davis knew of any protected activity. Davis testified that he learned about Wyatt's EEOC charge after she filed it.  He also testified that David Butler never told him about Wyatt's complaints, that no one else discussed any complaints with him, that he did not know why Mullen left Nissan, and that he never learned about the hotel incident.

Without evidence contradicting Davis's testimony, the majority nevertheless accepts Wyatt's surmising that Davis must have known about her complaint given that he met with HR around the same time that HR interviewed Wyatt and Mullen.  Davis testified that during that meeting, he learned only that a complaint had been filed but not by whom or about what, and HR asked him only if he had seen any inappropriate behavior.  He testified that the meeting stayed "very general" and "[t]here were no names mentioned."  To support reversal here, the majority ignores this circuit's long-held admonition that "[m]ere conclusory and unsupported allegations, rooted in speculation, do not meet [the summary judgment] burden."  *Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir. 2003) (first alteration in original) (citation omitted); *see also Adair*, 452 F.3d at 491 ("Subjective beliefs, without affirmative evidence, are insufficient to establish a claim of retaliation.").  Since Wyatt presented no evidence that Davis knew of her complaints when he drafted the December 2015 MPIE, she cannot show causation and her claim fails.

As for the April 2016 performance evaluation, Wyatt contends Davis knew she contacted an attorney in January 2016.  Davis disputes this, testifying that he learned about Wyatt's contacting an attorney only when "Legal folks in HR told [him]," which he vaguely testified happened "when it happened."  This too offers only unhelpful temporal proximity.  Even assuming "when it happened" refers to January 2016, Wyatt still cannot show that her contacting an attorney in January caused Davis to issue her a poor performance evaluation three months later.  *See Arendale v. City of Memphis*, 519 F.3d 587, 606 (6th Cir. 2008).  As additional

---

**2**Footnote 8 in the majority opinion unpersuasively seeks to argue around this hearsay hurdle.

evidence of causation, the majority relies on Wyatt's assertion that she never before received a poor performance review. This is hardly compelling given that *other* managers submitted those reviews, and that undisputed testimony shows Davis received complaints about, and witnessed for himself, Wyatt's performance issues well before he learned of any protected activity. *See Montell*, 757 F.3d at 507; *Smith*, 302 F.3d at 834.

Wyatt's claim related to the January 2017 PIP fails for the same reason—no causation evidence.

## B. ADA and FMLA

Last, the ADA and FMLA retaliation claims likewise fail. As noted by the majority, these claims closely mirror the Title VII claims, relying on three of the same adverse employment actions: the MPIE, negative performance review, and PIP. And they fail for the same reason as the Title VII claims: Wyatt's evidence—temporal proximity and inadmissible hearsay—cannot show causation. The first alleged protected activity happened when Wyatt began medical leave in December 2015, but Davis prepared her MPIE before. And the evidence shows the performance review and PIP followed from Davis's pre-existing concerns about her performance. *See Stewart v. Esper*, 815 F. App'x 8, 21 (6th Cir. 2020) ("[I]f some of the actions occurred before and some after she filed her complaint, she has not shown a causal connection between the complaint and the alleged retaliatory actions since they were part of an ongoing pattern that predated the complaint."). Because she cannot show causation, Wyatt's ADA and FMLA retaliation claims fail.